[Civ. No. 34500. Second Dist., Div. Five. Apr. 23, 1970.]

RAYMOND V. CALZADA et al., Plaintiffs and Respondents, v.
J. M. SINCLAIR et al., Defendants and Appellants.

**COUNSEL**

J. M. Sinclair, in pro. per., for Defendants and Appellants.

David C. Marcus for Plaintiffs and Respondents.

**OPINION**

**FRAMPTON, J.*—**

### Statement of the Case

Plaintiffs Raymond V. Calzada and Ruth A. Calzada, husband and wife, by their amended complaint, sought to set aside a trustee's sale under a second deed of trust executed by them in favor of one Fannie H. Carelli securing a promissory note in the principal sum of $2,615.42, and which had been purchased by the defendant Rose Sinclair, the wife of defendant J. M. Sinclair, an attorney at law who had been retained by plaintiffs to represent them in connection with threatened foreclosure proceedings on a first deed of trust encumbering the same real property involved under the second deed of trust. The amended complaint prayed for a determination that defendants have no right, title or interest in the real property purchased at the trustee's sale under the second deed of trust, asked for the appointment of a receiver and for an accounting. Judgment was rendered in favor of the plaintiffs quieting their title in the real property as against the defendants, and directing the defendants to execute their quitclaim deed conveying to the plaintiffs all right, title and interest of the defendants therein. The appeal is from the judgment.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

*Statement of Facts*

Plaintiff, Ruth Calzada, and her husband, Raymond V. Calzada, purchased the real property described in the complaint on December 27, 1962. At the time of purchase, the property was encumbered by a first deed of trust executed by John and Fannie H. Carelli to secure a promissory note to the Pacific Savings and Loan Association, and upon which there was the principal sum due of $15,888.33. In connection with the purchase, the plaintiffs executed a second deed of trust on the real property here involved to secure the payment of a promissory note to Fannie H. Carelli, which, with certain advances made to the plaintiffs by Mrs. Carelli subsequent to the purchase, amounted to $2,774.

Plaintiffs became delinquent in their payments on the note secured by the first deed of trust to Pacific Savings and Loan Association, and the latter, on June 20, 1965, executed a notice of default and election to sell under this deed of trust. The Calzadas were also in arrears on their payments to the Carellis under the second deed of trust. On August 24, 1965, Mrs. Calzada retained the defendant J. M. Sinclair, an attorney at law, to represent the plaintiffs in connection with the pending foreclosure proceedings under the first deed of trust, and their difficulties under the second deed of trust. Mr. Sinclair told Mrs. Calzada that his fee would be $400, that she had nothing to worry about, he would handle the whole situation, and for her to come back in a week.

The following agreement was drawn by Mr. Sinclair and entered into between him and Mrs. Calzada as evidencing their arrangement:

"AGREEMENT

"Received of Ruth Calzada the sum of $272.24 on account of a fee of $400.00, the balance of which is payable before September 10, 1965, and in addition the sum of $183.00 will be deposited by Ruth Calzada with me toward the payments on the Pacific Savings and Loan Association trust deed and the hereinafter described second trust deed.

"Said fee will be fully earned by my obtaining a buyer for the second trust deed on the property at 130-32 North Arizona Avenue, East Los Angeles, California, which said buyer will pay the amount of money necessary to cancel the foreclosure now underway by Pacific Savings and Loan Association on the first trust deed on said property; said buyer will further agree to permit all principal, interest and advances to be paid at $50.00 per month including interest on the 15th day of each month until paid in full.

"Dated: August 24th, 1965.

[Signed]   J. M. Sinclair
_____
           J. M. Sinclair

"Accepted this 24th day of August, 1965.

[Signed]  Ruth  Calzada
_____
          Ruth Calzada"

Mr. Sinclair told Mrs. Calzada that for his fee he was going to get her out of the foreclosure. She gave him the information about the Carelli deed of trust, and he asked her to return in a week or so.

On August 24, 1965, Mrs. Calzada paid Mr. Sinclair $272.24 on his fee at the time the written agreement was executed, and later on the same day she paid him $75. The balance of $52.76 was paid on September 2, 1965.

Mrs. Calzada testified that on April 4, 1966, she paid Mr. Sinclair the sum of $75 as a "second installment" deposit. She testified further that she made payments to the Pacific Savings and Loan Association on the first deed of trust on the following dates and in the following amounts: January 21, 1966—$133; March 9, 1966—$133, and March 21, 1966—$133. She continued to make other payments to Mr. Sinclair for which he gave her no receipts. The dates and amounts of these payments are not shown in the record.

The second deed of trust was purchased from the Carellis by Mrs. Sinclair on August 25, 1965. This purchase was negotiated by Mr. Sinclair on behalf of his wife. The Calzadas first learned in October 1965, that Mrs. Sinclair had purchased the second deed of trust when Mr. Sinclair told Mrs. Calzada of the purchase, stating that "he was going to put it in Mrs. Sinclair's name because he couldn't put it in his name because he would get into trouble." Mrs. Calzada's reaction to this information was "I couldn't think of anything else, but I thought he was my attorney and that was it."

In November 1965, Mr. Sinclair visited the property, which was an apartment building consisting of four rental units. One of the units was occupied by the Calzadas. The three other units rented at $65 per month each, and the unit occupied by the Calzadas rented for $78.50 per month. On this occasion Mr. Sinclair asked for and received $232 in payment of the second installment of taxes on the property. Sometime thereafter, Mr. Sinclair told Mr. Calzada that the payments to him would have to be $75 per month. Mr. Calzada suggested that he and his wife would move, rent their apartment, and would apply the rent therefrom to the payment of the $75 per month obligation to Mr. Sinclair.

Shortly after August 24, 1965, Mr. Sinclair told Mrs. Calzada to hold onto some of the payments of $50 due under the agreement of August 24 relating to the second deed of trust and "not to worry about making two- or three-month payments to him, [but] to send him the money for the fund that he was holding for me." When asked what fund Mr. Sinclair was holding for her, Mrs. Calzada replied that she did not know, but that Mr. Sinclair had told her "that he was going to hold a fund for me in case I was going to try and be in some kind of trouble. . . . In case I was to get in trouble of any kind in my payments or anything." Mrs. Calzada testified that Mr. Sinclair "pushed-up" the payments to him on the second deed of trust from $50 to $75 per month, and told her to keep on paying this amount to him on the second trust deed note.

Mrs. Calzada testified that in April 1966 they were not in default under the second deed of trust, that they had made payments to Mr. Sinclair for which he gave no receipts, that everytime she tried to talk to him about receipts "He just wouldn't listen to anything."

The Calzadas continued to collect the rent from the property until June 3, 1966. Thereafter Mrs. Sinclair collected the rent with the aid of Mr. Sinclair.

On May 2, 1966, the trustee under the second deed of trust filed a notice of trustee's sale to be held on June 3, 1966, by reason of breach of certain obligations secured by the deed of trust, notice of which was recorded on September 17, 1965. On June 3, 1966, Mrs. Sinclair purchased the property at the trustee's sale. Both Mr. and Mrs. Calzada testified that they never received notice of the trustee's sale. Mrs. Calzada testified that the reason they did not receive notice of the default and notice of the trustee's sale was because they had moved from the premises sometime in April of 1966. Two envelopes addressed to Ruth A. Calzada and Raymond V. Calzada, respectively, from the Los Angeles Title and Abstract Corporation, bearing a postal mark of September 17, 1965, appear to have been returned to the title company unopened. Each is marked "Final Notice." They were produced in evidence from the file of the title company. From the same file there were produced two envelopes from the Newspaper Service Bureau Inc., addressed to Ruth A. Calzada and Raymond V. Calzada, respectively, one bearing a postal mark of May 9, 1966, and the other bearing a postal mark of May 10, 1966. Each of these envelopes, according to the "Affidavit of Mailing," contained a notice of trustee's sale under the second deed of trust. The envelopes appear to have been returned to the sender unopened.

Defendant J. M. Sinclair was called as a witness pursuant to the provisions of section 776 of the Evidence Code. He testified that he is an attorney at law having been admitted to practice for approximately 40 years. On

August 24, 1965, he talked with Mrs. Calzada, who retained him as her attorney to get someone to purchase the second deed of trust and who would pay up the amounts owed on the first deed of trust. The written agreement of August 24, 1965, constituted the attorney-client arrangement. Defendant Rose Sinclair is his wife, but he did not represent her as an attorney in this matter. He told his wife about the second deed of trust and persuaded her to buy it. He negotiated the sale to his wife for the benefit of the Calzadas. His wife was the only one he could get to purchase the Carelli note and trust deed and to pay off the delinquencies under the note and trust deed held by Pacific Savings and Loan Association. The money used to accomplish this came from his wife's separate property. The transfer of the Carelli note and deed of trust to his wife was consummated on August 25, 1965.

Mr. Sinclair testified further that sometime prior to September 17, 1965, he told his wife that the Calzadas had not made the payments under the August 24 retainer agreement of $183 to be deposited with him prior to September 10, $133 of which was to be used by him to make the payment of September 15 in the sum of $133 due on the first deed of trust note to Pacific Savings and Loan Association. He was not acting as attorney for the Calzadas in receiving and disbursing their funds because his contract "very definitely stated that my services terminated when I got the buyer to redeem from Pacific Savings and Loan." He had earned his fee and that ended his services to the Calzadas as their attorney when his wife purchased the second deed of trust and paid the delinquencies to Pacific Savings and Loan Association under the first deed of trust.

Mr. Sinclair testified further that he was advised by his wife that she was going to the office of the Los Angeles Title and Abstract Company on September 17, 1965, to have that company file a notice of default under the second deed of trust. On September 13, 1965, he had received the sum of $50 from the Calzadas as a deposit pursuant to the August 24 retainer agreement. This money represented a payment on the second deed of trust. He was not acting as the attorney for the Calzadas in receiving this money and turning it over to his wife. He saw the letter dated September 17, 1965, written on September 17, 1965, by the Los Angeles Title and Abstract Corporation to "Mrs. Rose Sinclair," wherein the title company acknowledged receipt of the note and second deed of trust, together with an initial deposit of $50. As of December 9, 1965, the Calzadas were not in default in their payments under the first deed of trust. At this time Mr. Sinclair prepared, and had Mrs. Sinclair sign, a letter addressed to the Los Angeles Title and Abstract Corporation requesting it to hold up further proceedings on the foreclosure of the second deed of trust until further notice. He

received the sum of $50 from the Calzadas on January 5, 1966. On January 11, 1966, he wrote the following letter to Mrs. Calzada:

"J. M. Sinclair, Attorney at Law

5682 York Boulevard

Los Angeles, California 90042

Phone 257-2004

Jan. 11, 1966

Dear Mrs. Calzada:

"I received the $50 to be held for you in accordance with our conversation.

"Now, you will have to make all payments on time to Pac S & L and add $75 or more each month not later than the 3rd of each month to the fund which I hold for you. When there is enough I will redeem the property from the foreclosure. If you fail in this the foreclosure will go on and the money in the fund will go to the payment of taxes first; then to the reduction of the Pac S & L loan.

Sincerely yours

/s/  J. M. Sinclair

"When the property is redeemed your payments will be the $50 per mo."

Thereafter he received the sums of $75 on February 3, $75 on April 4, and $75 on May 6, 1966, from the Calzadas under the terms of the letter of January 11. He testified that he was not holding these funds as attorney for the Calzadas. When asked from whom he was going to redeem the property, relating to the language in the letter of January 11, "When there is enough I will redeem the property from the foreclosure," he answered, "Well, my wife owned it. My wife was the one that foreclosed—I don't redeem it. I am trying to figure out the language there. I was going to reinstate. . . . I would use the money to pay my wife in order to reinstate the second trust deed in good order." He explained that in his receiving and holding the Calzadas' money, he was acting as an escrow holder, not as their attorney. He was acting at arm's length to both the Calzadas and the owner of the second deed of trust. He told the Calzadas "that when we made the deal, that whoever I sold it to, that it was the kind of transaction that I would have to get somebody who would take it strictly on my recommendation and that when I did so as long as they kept their payments up,

it would make no difference to them; but in the case of any conflict, I would have to stand by whoever the buyer was.

"I told them if I couldn't get any other buyer, I could get my wife to buy it and I told them that obviously if I got my wife to buy it, my wife—I would owe certainly as much of a duty to my wife, persuading her to buy it, as I would to them and that is the reason that I specified that my services were finished to them as soon as I got a buyer to meet the requirements."

Mr. Sinclair testified further that "from the minute" his wife purchased the note and second deed of trust there arose a conflict of interest between the Calzadas and his wife. That he then continued to receive payments from the Calzadas to hold as "a referee, as a trustee, as an escrow holder until they built up to the point where they could be used to terminate this default." That this was the meaning of the letter dated January 11, 1966, addressed to Mrs. Calzada.

On May 6, 1966, Mr. Sinclair wrote the following letter to Mrs. Calzada:

"J. M. Sinclair

Attorney at Law

5682 York Boulevard

Los Angeles, California 90042

Phone 257-2004

May 6, 1966

"Dear Mrs. Calzada:

"Your check for $75 received to-day together with your balance with me and funds I will request from the owner of the trust deed will be used to pay the April payment to Pacific S & L (which is now delinquent) as per your previous instructions to me. I will advise the owner to pay the May payment before delinquency to avoid the penalty. If you have sent a payment to Pacific advise me at once.

"I assume you have some plan for redeeming the property from the foreclosure and will advise me of same. If you have a new phone, let me know— also your new address.

Very truly yours

/s/ J. M. Sinclair

"PS  I find the check is marked 'payment on 2nd note.' Of course I cannot accept same and am returning it. Why don't you take it and $58.00 more and pay the April payment?"

Mr. Sinclair testified that he did not send this letter to the Calzadas as his clients. He was acting as an escrow holder "for the benefit of everybody involved." The trustee's deed upon sale of the second deed of trust, dated June 3, 1966, conveying the property to "Rose Sinclair, a married woman," was mailed to their residence addressed to Mrs. Sinclair, and was delivered by Mrs. Sinclair to him when the present action was commenced.

Mr. Sinclair testified further that he sent a notice to the tenants of the building stating that a foreclosure had been set for June 3, 1966, and that any rent beyond that period would have to be paid to whoever was the owner after that date. Subsequent to June 3, 1966, his wife collected the rents from the property and he assisted her. He kept a record of the rents so collected but did not have it in court at the time of his testimony. He testified that the monies he received from the Calzadas prior to June 3, 1966, he was holding for the purpose of "cancelling the foreclosure sale or whatever word you want to use." When asked if he returned any of these funds to the Calzadas after the foreclosure, he answered, "I got some more money from Mrs. Sinclair and paid the taxes." This was done under the arrangement set forth in his letter to Mrs. Calzada of January 11, 1966.

Mr. Sinclair testified further that on August 26, 1965, he paid to the Carellis the sum of $2,675 on behalf of Mrs. Sinclair and the trust deed note was endorsed over to her. On August 26, 1965, he paid $1,639.67 to Pacific Savings and Loan Association to reinstate the first deed of trust. The receipt for this payment indicates that the money was paid by "J. M. Sinclair." Mr. Sinclair testified concerning this that it was his wife's money. Mrs. Sinclair made the April and May, 1966 payments of $133 each to Pacific Savings and Loan Asociation due on the first deed of trust.

On August 24, 1965, Mr. Sinclair told Mrs. Calzada that he had made investments for himself in the past, but at that time he had no funds with which to make an investment, that he normally took trust deeds in his wife's name, the reason for this being that it was a convenience. If any trouble came up about collecting the money thereafter, it would be simpler for him to act as his wife's attorney than it would be for him to act as his own attorney on a trust deed taken in his name.

Mr. Sinclair testified that the money used to purchase the Carelli deed of trust was his wife's money which came from her mother's estate. Such money was kept in the bank, but he did not know which bank it was kept in. On cross-examination he admitted that the fund out of which the deed was purchased was made of the check given him by Mrs. Calzada, as part of his retainer fee, in the sum of $272.24, an American Express Company money order in the sum of $67, a Home Savings and Loan Company check in the sum of $2,100, and his personal check in the sum of $226.33.

Mr. Calzada valued the property at $27,500.

The trial court found, among other things, that on August 25, 1965, defendant J. M. Sinclair, without the knowledge or consent of plaintiffs, did solicit and purchase from Fannie H. Carelli the second deed of trust and caused it to be assigned to his wife. That Rose Sinclair, on September 17, 1965, caused the trustee under such deed to record a notice of default. That on May 2, 1966, with the consent and cooperation of defendant, Rose Sinclair caused the trustee to file a notice of trustee's sale for June 3, 1966. That on June 3, 1966, defendant Rose Sinclair purchased the property at the trustee's sale. That the notice of default and notice of sale were mailed to the address contained in the deed of trust executed in favor of Fannie Carelli, and were not received by the plaintiffs. That defendants at all times knew the present address and whereabouts of plaintiffs, but failed to notify plaintiffs of the notice of default or the notice of trustee's sale. That from August 24, 1965, until June 3, 1966, defendant J. M. Sinclair was acting as attorney for the plaintiffs, and since August 25, 1965, he acted for and represented defendant Rose Sinclair as her attorney, and acted in his own behalf. That defendant J. M. Sinclair did violate his professional duty and fiduciary relationship to plaintiffs in his failure to advise them that he intended to and did purchase the second deed of trust by acquiring the same in the name of his wife, and in accepting payments from plaintiffs while acting as their attorney, and in failing to notify the trustee of the address and whereabouts of plaintiffs, and by causing a notice of default, and a notice of trustee's sale of the property to be made, and the purchase thereof and the title to be taken in the name of Rose Sinclair.

The court found further that at all times during the transaction, defendant Rose Sinclair had knowledge of the attorney-client relationship between defendant J. M. Sinclair and plaintiffs; knew of the payments made by plaintiffs to defendant J. M. Sinclair; knew of the request for and notice of default, and notice of trustee's sale, and knew of the true whereabouts and address of plaintiffs and the nondelivery of such documents to them.

The court found further that defendants had collected all the rents on the property since June 1, 1966, and that the reasonable value of the rent on the three units was $282 per month.[1] The court concluded that plaintiffs were not indebted to defendants in any sum, and that defendant Rose Sinclair held title to the property in trust for plaintiffs. Judgment quieting title in the plaintiffs followed.

---

[1]The evidence discloses that there were four rental units instead of three rental units, and that three of the units were rented at $65 each per month and that the fourth unit had a rental potential of $78.50 per month. The sufficiency of this finding is not attacked here.

## Contentions on Appeal

Defendants urge that (1) a purchase by an attorney of a trust deed on his clients' real property may be sustained; (2) the trial court failed to make findings on all material issues of fact, thus affecting the substantial rights of defendants; (3) plaintiffs were guilty of laches, and (4) plaintiffs here were obligated to offer to return everything of value received from defendants in order to sustain their cause of action.

## Purchase of Trust Deed

In support of their contention that the purchase of the Carelli trust deed by J. M. Sinclair in the name of his wife may be sustained under the facts here shown, defendants cite and rely upon *Merchants Credit Assn. v. Brown,* 83 Cal.App.2d 296 [188 P.2d 558], and *Smallpage v. Winafred Orchards Co.,* 154 Cal.App.2d 676 [316 P.2d 751]. Neither case supports this contention. The facts in *Merchants Credit Association* disclose that one Charles A. Sunderlin was an attorney at law. Merchants Credit Association was his corporate *alter ego* created to handle certain collection matters arising from Sunderlin's law practice. His corporate *alter ego* acquired title to certain deeds of trust which were the property of an estate represented by Sunderlin. These trust deeds were not inventoried as assets of the estate, but were sold by Sunderlin's corporate *alter ego* and the proceeds thereof were not accounted for in the estate proceedings. The court found that Sunderlin and his corporate *alter ego* held such trust deeds and the proceeds from the sale thereof in a constructive trust for the benefit of the estate, and rendered judgment against them for the amount realized from the sale of such deeds. The court also denied recovery for services claimed to have been rendered for the benefit of the state in connection with the acquisition and sale of the trust deeds. The facts in *Smallpage* disclose that Smallpage, an attorney at law, jointly with Sue Ishida and Gladys Ishida, owned beneficial interests in real property held by Winafred Orchards Company. Smallpage, by negotiations with the Ishidas, acquired their beneficial interests in the property. Subsequent thereto, the State of California filed an action to cause the property to escheat to the state under the Alien Land Law. Smallpage paid the state $25,000 by way of compromise and settlement of this litigation. In 1952, the Alien Land Law was declared unconstitutional, and the Legislature enacted a remedial statute authorizing the state to refund moneys received by way of a compromise in an escheat action. The Ishidas claimed that they were entitled to a portion of the $25,000 refund from the state because at the time Smallpage acquired their interest in the real property he was their attorney and that he had violated his fiduciary duties owing to them by taking advantage of the Alien Land Law in concluding the agreement to acquire their interests.

The court found that at the time these negotiations took place Smallpage and the Ishidas dealt at arm's length, and the Ishidas were at all times represented by counsel of their own choosing; that during such negotiations, Smallpage acted with utmost fairness and paid the Ishidas the fair market value for their interests. Why the defendant, J. M. Sinclair, himself an attorney, cites these cases in support of his position on appeal, in the face of the record of his dealings with plaintiffs here, is not clear.

An attorney may not hide behind the apron strings of the community property laws to avoid an obligation to his client. ■ The commission of an act involving moral turpitude, dishonesty or corruption constitutes a cause for suspension. Moral turpitude, broadly defined, is conduct which is contrary to justice, honesty and good morals. ■ An attorney's duty of fidelity to his client involves far more than refraining from exercising undue influence. His fiduciary duty is of the very highest character. For this reason all business dealings between an attorney and client whereby the attorney benefits are closely scrutinzed for any unfairness on the attorney's part. (*Marlowe* v. *State Bar,* 63 Cal.2d 304 [46 Cal.Rptr. 326, 405 P.2d 150].) ■ Here, the defendant, J. M. Sinclair, accepted the sum of $400 as a retainer fee from the plaintiffs to represent them in their efforts to save their property from foreclosure under a first deed of trust then in default, and under a second deed of trust under which they were then delinquent in their payments. Within 24 hours of the time that defendant attorney accepted his fee and assumed his obligations as attorney for plaintiffs, he caused title to the note and second deed of trust to be taken in the name of his wife, thus creating, according to his own admission, an immediate conflict of interest between plaintiffs, himself as their attorney, and his wife. He continued then to actively participate in transactions and proceedings, without advising the plaintiffs that he no longer represented them as their attorney, which ultimately resulted in the loss of the property by foreclosure, and the acquisition of the title to the property in the name of his wife. The foreclosure proceedings were accomplished without notice to plaintiffs, although the record shows that he knew that they lived in one of the units on the premises at 130-132 North Arizona Avenue, East Los Angeles, and was able to communicate with them by mail as late as May 6, 1966. The military affidavit executed by defendant Rose Sinclair in connection with the trustee's sale shows plaintiffs' address as "130 No. Arizona, St., Los Angeles, Calif.," and shows the occupation of plaintiff Raymond V. Calzada to be a "high lift operator" employed by "General Motors." The trial court found that plaintiffs lived in one of the units on the premises to and including June 1, 1966. Notwithstanding this the notice of default of September 17, 1965, and the notice of trustee's sale of May 9, 1966, were both mailed to plaintiffs, addressed to 1820 Kempton Avenue,

Monterey Park, California, an address shown on the "Joint Tenancy Grant Deed" from Fannie H. Carelli to plaintiffs conveying the property to the latter, executed on December 27, 1962. The envelopes so addressed and containing the notice of default and the notice of trustee's sale were returned to the sender unopened. Conduct such as this on the part of the defendant J. M. Sinclair, while bound to act in his fiduciary capacity as an attorney at law for the benefit of his clients, respondents here, is tainted with unfairness. Such conduct, in the circumstances here shown, is sufficient to support the trial court's conclusion that defendant Rose Sinclair held title to the property in trust for plaintiffs.

### The Findings

Defendants urge that (1) no finding was made on the issue of laches; (2) no finding was made as to what plaintiffs received of value from defendants; (3) there is no evidence to support the finding that defendants knew the address of plaintiffs at the time of the foreclosure sale; (4) there is no evidence to support the finding that plaintiffs had no knowledge of notice of default, and (5) there is no evidence to support the finding that J. M. Sinclair did violate his professional duty. These contentions are baldly made with no reference to either the clerk's transcript or the reporter's transcript. They are supported by one citation taken verbatim from the syllabus in the case of *Frascona* v. *Los Angeles R. Corp.*, 48 Cal. App. 135 [191 P. 968], to the effect that "The right to findings is a substantial right, as inviolate, under the statute, as that of trial by jury under the Constitution." We are grateful to defendants for this much assistance in presenting to us authority in support of such a well known principle of law.

The clerk's transcript fails to disclose that any objections were made to the findings of fact, or that defendants requested specific findings of fact. (Cf. Code Civ. Proc., § 634.) No claimed infirmity in the findings appears to have been brought to the attention of the trial court either by way of motion for a new trial or by motion to vacate the judgment and enter another and different judgment. (Cf. Code Civ. Proc., §§ 657, 663.)

The original complaint was filed herein on June 3, 1966, the same day upon which the trustee's sale under the second deed of trust occurred. The answer was filed on May 22, 1967. The amended and supplemental complaint was filed on December 29, 1967. By stipulation, the answer to the complaint was deemed to be the answer to the amended and supplemental complaint. ■ The defense of laches was set out in the answer. In the state of the record here, the judgment of the court in favor of plaintiffs, in effect, found against defendants on the defense of laches, and it was not necessary for the court to make a specific finding thereon.

(*Kaye* v. *Jacobs,* 122 Cal.App. 421, 430-431 [10 P.2d 186]; overruled on other grounds in *Bumb* v. *Bennett,* 51 Cal.2d 294, 300 [333 P.2d 23]; *Scott* v. *Symons,* 191 Cal. 441, 457 [216 P. 604]; *Remiger* v. *Hassell,* 216 Cal. 209, 211 [13 P.2d 737].)

■    Without any reference to the record, defendants urge that the court made no finding as to what plaintiffs received of value from defendants. We are again compelled to assume defendants' burden of searching the record to ascertain the validity or invalidity of this contention. A search of the clerk's transcript discloses that the trial court found that defendant J. M. Sinclair paid the sum of $2,675.47 to Fannie Carelli on August 25, 1965, for the assignment of the second deed of trust, and on the same date he paid the sum of $1,639.67 to Pacific Savings and Loan Association on the first deed of trust. The court also found that since June 1, 1966, defendants collected the rental payments from the tenants of the property of the reasonable value of $282 per month. The court in its conclusions stated: "The plaintiffs Raymond V. Calzada and Ruth A. Calzada are not indebted to the defendant[s] in any sum whatsoever." Whether the foregoing may technically be treated as a finding of fact or a conclusion of law is immaterial here. It is to be noted that defendant J. M. Sinclair testified that he kept records in his office which would support the claims set forth in his answer bearing upon the income from the property and expenses paid in connection therewith. Our search of the record does not disclose that these records were ever produced in court or that other evidence was offered and received respecting these matters. Such matters set forth in the answer are deemed denied (Code Civ. Proc., § 462), and in the absence of proof thereof must be deemed untrue. (*Tustin Packing Co.* v. *Pacific Coast etc. Co.,* 21 Cal.App. 274, 275 [131 P. 338]; *Estate of Edwards,* 173 Cal.App.2d 705, 713 [344 P.2d 89].) If defendants desired findings on such matters as the total amount paid on the first deed of trust, taxes paid, water bills paid, moneys expended for insurance and repairs on the premises, as is claimed in their answer, it was their obligation under the law to establish the validity of such claims by competent evidence. In the absence of such evidence, defendants may not be heard to complain that the trial court erred in failing to make findings thereon. The evidence discloses that defendants expended the sum of $4,578.67 in acquiring the second deed of trust and in bringing the payments under the first deed of trust up to date, including the two payments under the latter deed made by defendant Rose Sinclair for the months of April and May 1966 in the sum of $133 each. The court found that defendants had collected rents from the property since June 1, 1966, which would amount to $8,460 received by defendants from rentals up to the date of judgment. In the state of the record here, the finding or conclusion of the court that plaintiffs were not indebted to defend-

ants, coupled with the other findings as to the moneys expended by defendants, are sufficient on the question of value received by plaintiffs from defendants in connection with the property.

The remainder of the contentions with respect to the insufficiency of the evidence to support the findings are not only made without reference to the record, but they are also without merit.

### Offer to Return Value Received

Defendants urge that before the client is entitled to make a claim against his attorney, such client is required to repay to the attorney all moneys laid out by him for the benefit of the client plus the reasonable value of his services. Defendants cite and rely on *Tomblin* v. *Hill*, 206 Cal. 689, 695 [275 P. 941]. *Tomblin* v. *Hill* stands for the proposition that an attorney, acting in good faith and with the full knowledge and approval of his client, who acquired title to his client's real property as trustee by the purchase of a sheriff's certificate at an execution sale upon a judgment against his client, and by purchasing various other judgments which constituted liens on his client's property, and who held title thereto through the period of redemption with full knowledge on the part of the client that her title to the property would be lost unless she redeemed it before the expiration of such period, is entitled to be reimbursed for his outlay and for a reasonable amount for his services before the client can claim the benefit of the purchase. The facts in *Tomblin* are inapposite to the facts here.

Here, the trial court concluded that the acts and conduct of the defendant J. M. Sinclair constituted a fraud upon the plaintiffs, as a result of which title to the property was held in trust for plaintiffs. This fraudulent conduct made the defendant Rose Sinclair an involuntary trustee of the property, and defendants, therefore, had none of the rights ordinarily existing in favor of a trustee. (Civ. Code, § 2275; *McArthur* v. *Goodwin*, 173 Cal. 499, 504-505 [169 P. 679].) The trial court, sitting as a court of equity, had jurisdiction and power to award defendants such sums as the evidence disclosed they were entitled. The evidence supports the court's ultimate finding or conclusion that plaintiffs were not obligated to repay any sum as a condition precedent to their right to title.

The judgment is affirmed.

Kaus, P. J., and Reppy, J., concurred.

A petition for a rehearing was denied May 11, 1970, and appellants' petition for a hearing by the Supreme Court was denied June 17, 1970.