**In the Matter of Charles W. COLSON, a Member of the Bar of the District of Columbia Court of Appeals.**

No. S–24–74/D–27–78.

District of Columbia Court of Appeals.

Argued April 14, 1978.

Decided March 23, 1979.

Opinions Filed July 3, 1979.

1161

John W. Douglas, Washington, D. C., appointed by the court, amicus curiae.

Charles H. Morin, Washington, D. C., for respondent.

Before NEWMAN, Chief Judge, and KELLY, KERN, GALLAGHER, NEBEKER *, YEAGLEY, HARRIS *, MACK and FERREN, Associate Judges.

KELLY, Associate Judge:

On June 3, 1974, respondent Charles W. Colson, former White House Aide and Special Counsel to then President Richard M. Nixon, pleaded guilty before Judge Gerhard Gesell of the United States District Court for the District of Columbia to a violation of 18 U.S.C. § 1503 (1970), a felony.[1] Re-

---

* Associate Judges NEBEKER and HARRIS reserve the right to file a statement of dissenting views at a later date. In the event a dissenting opinion is filed, the judges who concur in the majority opinion reserve the right to file separate statements of their views at a later date.

1. 18 U.S.C. § 1503 (1970) proscribes obstruction of justice and provides:

spondent was subsequently sentenced to a prison term of one to three years and fined $5,000.[2] Upon receipt of a certificate of his conviction, this court by an order dated June 28, 1974, suspended respondent from the practice of law pursuant to D.C.App. R. XI, Sec. 15(1).[3] The matter was then referred to the Disciplinary Board[4] where formal proceedings were instituted before a hearing committee. The hearing committee unanimously recommended to The Board that respondent be disbarred. A majority of four members of The Board voted instead to suspend respondent for a period of five years. The three dissenting members voted for disbarment. Thereafter, this court denied the motions of respondent and Bar Counsel to dispense with argument and the filing of briefs and appointed amicus curiae to advocate the view of the minority members of The Board before the en banc court. *See* Amended D.C.App. R. XI, Sec. 8.

The information to which respondent pleaded guilty charged that, while serving as Special Counsel to the President of the United States, respondent:

On or about June 28, 1971, and for a period of time thereafter, in the District of Columbia and elsewhere . . . unlawfully, willfully and knowingly did corruptly endeavor to influence, obstruct and impede the due administration of justice in connection with the criminal trial of Daniel Ellsberg under indictment in the case of *United States v. Russo*, Criminal Case No. 9373, United States District Court, Central District of California, by devising and implementing a scheme to defame and destroy the public image and credibility of Daniel Ellsberg and those engaged in the legal defense of Daniel

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States magistrate or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, magistrate, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

2. On June 25, 1974, based upon his conviction, respondent was disbarred in the United States District Court for the District of Columbia. Disciplinary proceedings were also commenced against respondent in Massachusetts and Virginia. On January 20, 1975, the Supreme Court of Virginia entered an order disbarring Mr. Colson; on November 4, 1975, the Supreme Judicial Court for the Commonwealth of Massachusetts issued an opinion and order suspending respondent indefinitely from the practice of law.

3. The Rules of this court governing the Bar of the District of Columbia were amended on January 12, 1978, during the pendency of this proceeding. Rules cited herein which are not identified as "former" or "amended" have remained essentially unchanged.

Former Section 15—Attorneys Convicted of Serious Crimes

(1) Upon the filing with the court of a certificate demonstrating that an attorney has been convicted of a serious crime as hereinafter defined, the court shall enter an order immediately suspending the attorney, whether the conviction resulted from a plea of guilty or nolo contendere or from a verdict after trial or otherwise, and regardless of the pendency of an appeal, pending final disposition of a disciplinary proceeding to be commenced upon such conviction.

4. Amended D.C.App. R. XI, Sec. 4, redesignates the Disciplinary Board as the Board on Professional Responsibility. The amendments to this section expand the number of members to nine, provide for non-lawyer members, and reestablish what shall constitute a quorum for certain matters. The Board's function remains basically unchanged, however. For the purpose of simplicity we refer to this body as "The Board" throughout the remainder of this opinion.

Ellsberg, with the intent to influence, obstruct, and impede the conduct and outcome of the criminal prosecution then being conducted in the United States District Court for the Central District of California.

The aforesaid scheme by which CHARLES W. COLSON, the DEFENDANT, unlawfully, willfully and knowingly did corruptly endeavor to influence, obstruct and impede the due administration of justice in connection with the criminal prosecution of Daniel Ellsberg consisted of the following acts:

(1) In July and August 1971, the DEFENDANT and others unnamed herein, endeavored to and did release defamatory and derogatory allegations concerning one of the attorneys engaged in the legal defense of Daniel Ellsberg for the purpose of publicly disseminating said allegations, the known and probable consequences of which would be to influence, obstruct, and impede the conduct and outcome of the criminal prosecution of Daniel Ellsberg.

(2) In July and August 1971, the DEFENDANT, and others unnamed herein, endeavored to obtain, receive and release confidential and derogatory information concerning Daniel Ellsberg, including information from the psychiatric files of Daniel Ellsberg, for the purpose of publicly disseminating said information, the

known and probable consequences of which would be to influence, obstruct, and impede the conduct and outcome of the criminal prosecution of Daniel Ellsberg.[5]

More specifically, the evidence presented before the hearing committee indicates that the release to the public of the "Pentagon Papers" by Daniel Ellsberg in June 1971, aroused the intense anger and concern of President Nixon. The President stated to respondent that he wanted the leaks of sensitive information stopped no matter what the cost. Respondent was instructed to encourage congressional hearings, and to disseminate material to the news media that would "expose" Ellsberg and his motives. Respondent undertook the assignment willingly.[6]

The Board found respondent's conduct to have explicitly violated Disciplinary Rules 1–102(A)(3) and 1–102(A)(5).[7] Having concluded that the offense here involved moral turpitude, *see* Disciplinary Rule 1–102(A)(3), The Board recommended respondent's suspension from the bar of this court. Because of legislative fiat, however, we are precluded from adopting The Board's recommendation.

D.C.Code 1973, § 11–2503(a) provides:

When a member of the bar of the District of Columbia Court of Appeals is *convicted of an offense involving moral*

---

**5.** In consideration of respondent's plea to this information, the Watergate Special Prosecutor, Leon Jaworski, indicated his willingness to dismiss two felony indictments then pending against respondent in the cases of *United States v. Ehrlichman, et al.*, and *United States v. Mitchell, et al.* The former case grew out of the warrantless break in and search by agents of the Executive Branch of the offices of Dr. Louis Fielding for the purpose of securing the medical records of one of his patients, Daniel Ellsberg. *See United States v. Ehrlichman*, 178 U.S.App.D.C. 144, 546 F.2d 910 (1976), *cert. denied*, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977). The latter case originally charged seven individuals with conspiracy, obstruction of justice, and various instances of false statements made to the Federal Bureau of Investigation, to the grand jury, and to the Senate Select Committee on Presidential Campaign Activities. These charges arose from the alleged cover-up in the "Watergate" affair. *See United*

States v. Haldeman, 181 U.S.App.D.C. 254, 559 F.2d 31 (1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Jaworski's letter which explicates the plea bargain is attached as an appendix to this opinion.

**6.** Report of the Hearing Committee to the Disciplinary Board, Findings of Fact at 5.

**7.** Disciplinary Rule 1–102(A)(3) and (5) provide:

Misconduct.

(A) A lawyer shall not:

* * * * * *

(3) Engage in illegal conduct involving moral turpitude that adversely reflects on his fitness to practice law.

* * * * * *

(5) Engage in conduct that is prejudicial to the administration of justice.

*turpitude,* and a certified copy of the conviction is presented to the court, the court shall, pending final determination of an appeal from the conviction, suspend the member of the bar from practice. Upon reversal of the conviction the court may vacate or modify the suspension. *If a final judgment of conviction is certified to the court, the name of the member of the bar so convicted shall be struck from the roll of the members of the bar and he shall thereafter cease to be a member.* Upon the granting of a pardon to a member so convicted, the court may vacate or modify the order of disbarment. [Emphasis supplied.]

■ A valid guilty plea acts as both a conviction of the offense charged and as an admission of all material facts alleged by the government. *Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). *See Curtis v. United States,* D.C. App., 268 A.2d 603 (1970). Hence respondent's conviction became final as soon as Judge Gesell sentenced him upon his plea. The finality of the conviction coupled with The Board's finding of moral turpitude requires the disbarment of respondent as mandated by the clear language of the statute.

■ To be sure, the statute is mandatory in its terms. *Laughlin v. United States,* 154 U.S.App.D.C. 196, 199 n.3, 474 F.2d 444, 447 n.3 (1972), *cert. denied,* 412 U.S. 941, 93 S.Ct. 2784, 37 L.Ed.2d 402 (1973). Yet, there has been some concern expressed as to whether such legislation can be reconciled with the due process rights of the attorney in question. It is elementary that a fundamental requirement of due process is notice that apprises the interested parties of the pendency of the action and affords them an opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The same principles apply to disbarment proceedings. *In re Ruffalo,* 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871); *Ex Parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866); *In re Wild,* D.C.App., 361 A.2d 182, 184 (1976).

■ The notice requirement is fully satisfied in a case such as this by the language of this court's order of suspension which precedes the action before The Board, and the filing of a Petition Instituting Formal Disciplinary Proceedings with The Board. The suspension order here was the standard order issued by this court pursuant to D.C. App. R. XI, Sec. 15, and stated, *inter alia,* that respondent's suspension was to "remain in effect pending further order of this Court following final disposition of the disciplinary proceeding to be commenced by the Disciplinary Board."

As provided in amended D.C.App. R. XI, Sec. 7(2) (and as was done in the instant case), Bar Counsel institutes formal disciplinary proceedings "by the filing of a petition with the Board . . . which shall be sufficiently clear and specific to inform the respondent of the alleged misconduct. A copy of the petition shall be served upon the respondent."

■ As for the attorney's opportunity to be heard, D.C.Code 1973, § 11–2503(a) in effect makes such a hearing necessary. Even though the statutory language is mandatory in nature, a determination must be made as to whether the offense giving rise to the conviction involved moral turpitude. However, a distinction must be drawn here between offenses which manifestly involve moral turpitude by virtue of their underlying elements, and those which do not. An attorney is subject to disbarment under the statute for his *conviction of a crime* involving moral turpitude, not for his *commission of an act* involving moral turpitude. The threshold focus of the statute, then, is on the *type* of crime committed rather than on the factual context surrounding the actual commission of the offense. The Board, therefore, must make an initial determination as to whether the attorney's crime inherently involves moral turpitude. If The Board decides that it does, that is the end of the inquiry; The Board must recommend disbarment.

■ If the particular crime at issue has not been considered by this court, then the attorney may brief and argue the moral turpitude question at the hearing before The Board. Once, however, we have made a final determination that a crime involves moral turpitude, The Board must adhere to that ruling, with the result that the hearing at The Board level shall be limited to the question whether the certificate of conviction used in this court's order of suspension (or otherwise provided to The Board) establishes that the attorney, in fact, has been convicted of the crime charged.[8]

■ In this case, while The Board found respondent guilty of a crime of moral turpitude, The Board considered the circumstances of the transgression in addition to the inherent nature of the crime. Although it is possible that some—if not many—crimes, on their face, will not be susceptible of a determination that they do, or do not, involve moral turpitude per se, we find no difficulty in concluding that the obstruction of justice offense set forth in 18 U.S.C. § 1503 (1970) is inherently an offense involving moral turpitude. *See Laughlin v. United States, supra; In re Brown,* 197 S.E.2d 814 (W.Va.1973); *In re Kahn,* 38 A.D.2d 115, 328 N.Y.S.2d 87, *aff'd,* 31

N.Y.2d 752, 338 N.Y.S.2d 434, 290 N.E.2d 435 (1972); *In re Barron,* 155 W.Va. 98, 181 S.E.2d 273 (1971).[9] Therefore, in the instant case, the need for the extensive hearing before the hearing committee and The Board was obviated by the nature of the offense to which respondent pleaded guilty. The only proper recommendation for The Board to make under the circumstances was that respondent be disbarred. *See* D.C. Code 1973, § 11–2503(a).[10]

■ On the other hand, where an attorney stands convicted of a crime which according to The Board's initial determination does not inherently involve moral turpitude, a full hearing becomes necessary. In such cases, both the hearing committee and The Board should explore the question by hearing testimony in addition to argument from Bar Counsel and respondent.

■ To summarize, D.C.Code 1973, § 11–2503 provides that a member of the bar shall be suspended from practice by this court upon our receipt of a certified copy of the conviction of an offense involving moral turpitude. This court has promulgated rules which elaborate on this preliminary or *pendente lite* suspension procedure. *See*

8. In a situation where the moral turpitude issue has been decided on the basis of an earlier decision by this court, a respondent's constitutional guarantee of due process is safeguarded not only by the hearing necessary to verify his conviction but also by his right to a jury trial and appellate review of the criminal conviction itself. *See In the Matter of Abrams,* 38 A.D.2d 334, 329 N.Y.S.2d 364 (1972). We note that the state of New York has a statute which closely resembles D.C.Code 1973, § 11–2503(a). It provides for automatic disbarment upon an attorney's conviction of a crime cognizable as a felony. Judiciary Law § 90, subd. 4.

9. In *Laughlin v. United States, supra* 154 U.S. App.D.C. at 199, 474 F.2d at 447, the court, citing D.C.Code 1973, § 11–2503, upheld the disbarment of Laughlin based both on obstruction of justice and perjury charges. The *Laughlin* court characterized obstruction of justice and perjury as "two offenses which belie the basic character qualification required of a lawyer . . . ." *Id.*

10. We recognize that there will be situations in which the question whether a crime inherently involves moral turpitude is very difficult, and

that in such cases The Board accordingly will want to err on the side of admitting evidence that goes to the moral implications of the particular respondent's acts, as a way of determining whether *his particular offense* involved moral turpitude, even if the crime cannot be said per se to do so. Thus, our conclusion here that obstruction of justice inherently involves moral turpitude is not a criticism of the hearing committee's and The Board's willingness to develop the record fully, in case we had to make an *ad hoc* judgment. The hearing committee, of course, will have to decide how extensive a hearing to conduct. Nothing in our rules would preclude a procedure whereby The Board, under its own rules, could determine—before referring a matter to a hearing committee—whether a particular crime per se involves moral turpitude. If The Board concluded that it did, the hearing committee's work, and then The Board's, would be simplified. If a matter were then referred to this court for disbarment and we were to disagree with the per se moral turpitude finding, we would remand for a more extensive evidentiary hearing.

D.C.App. R. XI, Sec. 15.[11] For purposes of this *pendente lite* suspension, this court summarily determines whether the crime in question fits within the definition of "serious crime" as set forth in D.C.App. R. XI, Sec. 15(2). If we find that it does, we will order the attorney's suspension.[12] This preliminary suspension is to remain in effect pending final determination of an appeal from the conviction. Upon reversal of the conviction, this court may modify the suspension within its discretion. Moreover, upon good cause shown, we may set aside the suspension order when it appears that the interest of justice so requires. *See* Amended D.C.App. R. XI, Sec. 15(1).[13]

 After entering the suspension order, the matter is referred to The Board for the institution of a formal proceeding before a hearing committee to determine the nature of the final discipline to be imposed.[14] Although the procedure before The Board is set out in Amended D.C.App. R. XI, Sec. 7 [15] (*former D.C.App. R. XI, Sec.*

11. Amended D.C.App. R. XI, Sec. 15(1) and (2) provide:

(1) Upon the filing with the Court of a certificate demonstrating that an attorney has been convicted of a serious crime as hereinafter defined, the Court shall enter an order immediately suspending the attorney, whether the conviction resulted from a plea of guilty or *nolo contendere* or from a verdict after trial or otherwise, and regardless of the pendency of an appeal, pending final disposition of a disciplinary proceeding to be commenced upon such conviction. Upon good cause shown, the Court may set aside such order restraining the attorney from engaging in the practice of law when it appears in the interest of justice so to do.

(2) The term "serious crime" shall include any felony and any lesser crime a necessary element of which, as determined by the statutory or common law definition of such crime, involves improper conduct as an attorney, interference with the administration of justice, false swearing, misrepresentation, fraud, wilful failure to file income tax returns, deceit, bribery, extortion, misappropriation, theft, or an attempt or a conspiracy or solicitation of another to commit a "serious crime."

12. This allows The Board to determine *de novo* whether an attorney convicted of a felony or other crime we have deemed "serious" for purposes of D.C.App. R. XI, Sec. 15(1) questions— or have not deemed serious (and thus not immediately suspended)—was guilty of a crime involving moral turpitude. We do not here decide that all felonies and other serious crimes covered by summary suspension under Sec. 15(1) are per se moral turpitude crimes. We prefer to resolve that question on a case by case basis, aided by The Board.

13. Amended *D.C.App. R. XI, Sec. 15(1) is set* out in note 11, *supra.*

14. *See* D.C.App. R. XI, Sec. 15(4), which provides:

Upon the receipt of a certificate of conviction of an attorney for a serious crime, the Court shall, in addition to suspending him in accordance with the provisions of [D.C.App. R. XI, Sec. 15(1)], also refer the matter to the Board for the institution of a formal proceeding before a hearing committee, in which the sole issue to be determined shall be the nature of the final discipline to be imposed, provided that a disciplinary proceeding so instituted will not be brought to hearing until all appeals from the conviction are concluded.

15. Amended D.C.App. R. XI, Sec. 7(2) and (3) provide:

(2) Formal Hearing. Formal disciplinary proceedings before a hearing committee shall be instituted by Bar Counsel by the filing of a petition with the Bar Board (with a copy to the Clerk of the Court) which shall be sufficiently clear and specific to inform the respondent of the alleged misconduct. A copy of the petition shall be served upon the respondent. The respondent shall serve a copy of his answer upon Bar Counsel and file the original with the Board within 20 days after service of the petition, unless the time is extended by the Chairman. In the event the respondent fails to answer, the charges shall be deemed admitted, provided, however, that a respondent who fails to answer within the time provided may obtain permission of the Chairman to file an answer if the failure to file an answer was attributable to mistake, inadvertence, surprise, or excusable neglect.

Following service of the answer or upon failure to answer, the matter shall be assigned by the Chairman to a hearing committee.

A hearing committee member who has reviewed Bar Counsel's recommended disposition of a matter, as set forth in paragraph (1) of this section, shall not take part in any formal disciplinary proceeding regarding the same matter, except for the probable cause hearing referred to in paragraph (1).

If there are any issues of fact raised by the pleadings, or if the respondent requests the opportunity to be heard in mitigation, the hearing committee shall serve a notice of

8), in a case such as this where the respondent has been convicted of a crime, the only question before the hearing committee and The Board is whether the offense involved moral turpitude. And, only in a disciplinary proceeding based upon the conviction of a crime, where the nature of the crime is not such as plainly and unquestionably offends the generally accepted moral code, must evidence as to the circumstances of the crime including the actor's knowledge and intention be admitted. Such evidence is admissible even though respondent has pleaded guilty; and likewise, evidence is admissible as to the circumstances under which such plea was entered. This evidence is to be considered solely with reference to the issue of moral turpitude, not for the purpose of arguing the validity of the criminal conviction. Thus, we are not suggesting that a respondent may re-try his criminal case before The Board. Indeed, it is well settled that an attorney cannot collaterally attack a conviction in subsequent disbarment proceedings, and the record of the conviction is taken as conclusive proof that the attorney did the underlying acts which constitute the crime. *Laughlin v. United States, supra* 154 U.S.App.D.C. at 206, 474 F.2d at 454; *In re Braverman,* 148 F.Supp. 56 (D.Md.1957); *In re Tinkoff,* 101 F.2d 341 (7th Cir. 1938), *cert. denied,* 308 U.S. 552, 60 S.Ct. 99, 84 L.Ed. 464 (1939). *See Duggan v. State Bar of California,* 17 Cal.3d 416, 130 Cal.Rptr. 715, 551 P.2d 19 (1976); *Maryland State Bar v. Hirsch,* 274 Md. 368, 335 A.2d 108, *cert. denied,* 422 U.S. 1012, 95 S.Ct. 2638, 45 L.Ed.2d 676 (1975). *See also* D.C.App. R. XI, Sec. 15(3).

The term "moral turpitude" has less than a finite definition. We therefore

hearing upon Bar Counsel and the respondent, or his counsel, stating the date and place of the hearing at least 15 days in advance thereof. The notice of hearing shall advise the respondent that he is entitled to be represented by counsel, to cross-examine witnesses, and to present evidence in his own behalf.

The hearing committee shall in every case submit a report containing its findings and recommendation, together with a record of its proceedings and briefs, if any were submitted, to the Board within 60 days after the conclusion of its hearing. In the event of a hearing committee's noncompliance with this provision, the Board, in its discretion, may so advise the Court and request intercession by the Court.

(3) Review by the Board and Court. Upon receipt of a report from a hearing committee, the Board shall set the dates for submission of briefs and for oral argument before the Board. If neither the respondent nor Bar Counsel objects to the findings and recommendation of the hearing committee, oral argument and the submission of briefs may be waived by stipulation, subject to the approval of the Board. The Board shall promptly after the conclusion of oral argument or waiver thereof either affirm or modify the recommendation of the hearing committee, remand the matter for further proceedings before the hearing committee, or dismiss the petition. In the event the Board determines that the proceeding shall be concluded by reprimand, it shall instruct Bar Counsel to so notify the respondent in writing.

Unless the Board shall dismiss or remand the petition or the matter is concluded by reprimand, the Board shall promptly submit a report containing its findings and recommendation, together with the entire record, to the Court. After the filing of the report, a copy thereof shall be served on the respondent. The respondent may file exceptions to the report within 20 days from the date of service of a copy thereof, or within an additional period not to exceed 20 days granted by this court for good cause shown.

If exceptions to the report are filed by the respondent, the Court shall schedule the matter for the submission of briefs and oral argument in accordance with the general rules governing civil appeals. Upon conclusion of the proceedings, or upon consideration of the report if no exceptions thereto are filed by the respondent, the Court shall enter an appropriate order as soon as the business of the Court permits. In considering the appropriate order, the Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted.

Proceedings before the Board and proceedings, if any, before the Court shall be conducted by Bar Counsel.

The Court reserves the right with respect to all disciplinary proceedings in which a dismissal, informal admonition, or reprimand is contemplated or effectuated to review the matter and to enter an appropriate order with respect thereto, including an order directing further proceedings.

set out a model to assist The Board in disposing of those cases where such a hearing is necessary. If a crime is one involving moral turpitude, it is because the act denounced by the statute offends the generally accepted moral code of mankind. The definition of "moral turpitude" given in 2 Bouv. Law Dictionary 2247 (Rawle's Third Revision), is as follows:

> An act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men or to society in general, contrary to the accepted and customary rule of right and duty between man and man.

And, Black's Law Dictionary 1160 (4th ed. 1951), adds that moral turpitude is "[c]onduct contrary to justice, honesty, modesty, or good morals." These are precisely the definitions which have been used by the courts in defining "moral turpitude" in disbarment proceedings. *See, e. g., In re West,* 155 W.Va. 648, 186 S.E.2d 776, 777 (1972); *Calzada v. Sinclair,* 6 Cal.App.3d 903, 86 Cal.Rptr. 387 (1970); *In re Carr,* 377 Ill. 140, 36 N.E.2d 243 (1941); *State ex rel. Conklin v. Buckingham,* 59 Nev. 36, 84 P.2d 49 (1938); *In re Bartos,* 13 F.2d 138 (D.Neb. 1926); *In re Henry,* 15 Idaho 755, 99 P. 1054 (1909).

Respondent Colson spent considerable time arguing before the hearing committee and the Disciplinary Board in mitigation of his guilty plea and the conduct which was outlined in the information. As we have stated, this procedure was unnecessary. Since the crime to which respondent pleaded guilty is one which inherently involves moral turpitude, we are compelled, by virtue of the statute, to order his name stricken from the roll of the members of the bar of this court. *See* D.C.Code 1973, § 11–2503(a).

The effective date of respondent's disbarment shall be June 28, 1974, which was the date of his suspension from the bar of this court pursuant to D.C.App. R. XI, Sec. 15.

*So ordered.*

## APPENDIX

### WATERGATE SPECIAL PROSECUTION FORCE
United States Department of Justice
1425 K Street, N.W.
Washington, D.C. 20005

May 31, 1974

David I. Shapiro, Esq.
Dickstein, Shapiro & Morin
1735 New York Avenue, N.W.
Washington, D.C. 20006

Dear Mr. Shapiro:

On the understandings specified below, the United States will accept a guilty plea from your client, Charles W. Colson, to a one-count information charging him with obstructing justice in connection with the criminal prosecution of Daniel Ellsberg, in violation of Title 18, United States Code, Section 1503. This will dispose of all pending charges in the cases of United States v. Ehrlichman, et al., Criminal No. 74–116, and United States v. Mitchell, et al., Criminal No. 74–110. It will also dispose of all potential charges against your client which might otherwise arise out of those matters which are or have been under active investigation by the Watergate Special Prosecution Force.

This disposition is predicated on the understanding that the United States will move for leave to file a dismissal of all pending charges against Mr. Colson as set forth in the indictment filed March 1, 1974, Criminal No. 74–110, charging Mr. Colson, among others, with conspiracy and obstructing justice, and the indictment filed March 7, 1974, Criminal No. 74–116, charging Mr. Colson, among others, with conspiracy against rights of citizens. This disposition will not bar prosecution for any false or misleading testimony given hereafter.

This understanding is also predicated upon the fact that Mr. Colson will immediately provide statements under oath and will produce all relevant documents in his possession upon the request of the Watergate Special Prosecution Force. He may be required to testify as a witness for the United States in any and all cases with respect to which he may have relevant information.

The United States will make no recommedation concerning Mr. Colson's sentencing but will bring to the attention of the probation authorities and the Court information concerning Mr. Colson relating to. those cases in which Mr. Colson is presently charged. The United States will· join with you in urging that Mr. Colson be permitted to remain on recognizance pending sentencing. The United States, if requested, will provide to any investigative, disciplinary or fact-finding body information concerning Mr. Colson.

Sincerely,
LEON JAWORSKI
Special Prosecutor

---

Before NEWMAN, Chief Judge, and KELLY, KERN, GALLAGHER, NEBEKER, HARRIS, MACK and FERREN, Associate Judges, and YEAGLEY, Associate Judge, Retired.*

The majority opinion for the en banc court disbarring respondent Colson was issued on March 23, 1979. The first footnote to that opinion stated:

Associate Judges NEBEKER and HARRIS reserve the right to file a statement of dissenting views at a later date. In the event a dissenting opinion is filed, the judges who concur in the majority opinion reserve the right to file separate statements of their views at a later date. [412 A.2d at 1161.]

Consistent with the first sentence of that footnote, the following separate opinion is issued.

HARRIS, Associate Judge, with whom Associate Judge NEBEKER concurs:

The majority opinion for the court deals with this case in a manner which I feel obliged to characterize—with reluctance—as disingenuous. The majority opinion makes disbarment appear both routine and inevitable. In reaching such a result, however, the court effects major changes in our disciplinary procedures, without acknowledging that it is doing so. I am unable to acquiesce in the majority's treatment of such important issues, and accordingly express these dissenting views.

I

In setting forth the reasons for my inability to agree with my colleagues, initial ref-

---

* Judge Yeagley was an Associate Judge of this court at the time of oral argument; his status changed to Associate Judge, Retired, on April 20, 1979.

erence should be made to the Constitution of the United States. Section 1 of Article III of the Constitution provides in part: "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behavior, . . ." Thus, the Supreme Court, and, *inter alia*, the United States District Courts and the United States Courts of Appeals as thereafter created by Congress, often are referred to as Article III courts. On the other hand, this court was created by Congress under Section 8 of Article I of the Constitution, which empowers the Congress in part "To constitute Tribunals inferior to the supreme Court."[1]

The majority opinion discusses (and bases its disbarment upon) what is now § 11–2503(a) of the District of Columbia Code. Prior to 1971, disciplinary jurisdiction over attorneys in the District of Columbia was vested in the United States District Court for the District of Columbia. The relevant statute had existed in roughly the same form since 1901. As phrased in § 11–2103 of the 1967 edition of the District of Columbia Code (77 Stat. 505), it provided in pertinent part:

> When a member of the bar of the United States District Court for the District of Columbia is convicted of an offense involving moral turpitude, . . . the name of the member so convicted may thereupon, by order of the court, be struck from the role of the members of the bar, and he shall thereafter cease to be a member thereof. * * *

This court acquired the responsibility for the professional discipline of attorneys admitted to practice in this jurisdiction as one consequence of the passage of the District of Columbia Court Reform and Criminal Procedure Act of 1970. Act of July 29, 1970, Pub.L.No.91–358, 84 Stat. 473 *et seq.*

(codified at D.C.Code 1973, § 11–101 *et seq.*). The relevant provisions of that Act are few in number, and warrant quotation for easy reference.

D.C.Code 1973, § 11–2501(a), states:

> The District of Columbia Court of Appeals shall make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion.

Section 11–2502 of the Code provides in part:

> The District of Columbia Court of Appeals may censure, suspend from practice, or expel a member of its bar for crime, misdemeanor, fraud, deceit, malpractice, professional misconduct, or conduct prejudicial to the administration of justice. * * *

It is apparent that those two statutes confer plenary jurisdiction upon this court in the vitally important area of professional discipline. Somewhat inconsistent therewith are the two subsections of § 11–2503 of the D.C.Code. I quote and comment briefly upon each.

First, § 11–2503(a) provides:

> When a member of the bar of the District of Columbia Court of Appeals is convicted of an offense involving moral turpitude, and a certified copy of the conviction is presented to the court, the court shall, pending final determination of an appeal from the conviction, suspend the member of the bar from practice. Upon reversal of the conviction the court may vacate or modify the suspension. If a final judgment of conviction is certified to the court, the name of the member of the bar so convicted shall be struck from the roll of the members of the bar and he shall thereafter cease to be a member. Upon the granting of a pardon to a member so convicted, the court may vacate or modify the order of disbarment.

---

1. Section 8 of Article I also empowers Congress "To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square), as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, . . ."

That subsection presents various problems, a principal one of which concerns due process. An attorney's right to practice his profession obviously is a valued one, which may not be taken away without proper notice and a fair hearing. *See, e. g., In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); *In re Jones*, 506 F.2d 527 (8th Cir. 1974); *cf. Dixon v. Love*, 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977); *Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971).

Second, § 11–2503(b) states:

Except as provided in subsection (a), a member of the bar may not be censured, suspended, or expelled under this chapter until written charges, under oath, against him have been presented to the court, stating distinctly the grounds of complaint. The court may order the charges to be filed in the office of the clerk of the court and shall fix a time for hearing thereon. Thereupon a certified copy of the charges and order shall be served upon the member personally, or if it is established to the satisfaction of the court that personal service cannot be had, a certified copy of the charges and order shall be served upon him by mail, publication, or otherwise as the court directs. After the filing of the written charges, the court may suspend the person charged from practice at its bar pending the hearing thereof.

Here again, in the interest of brevity I comment only generally. That subsection provides for an abundance of due process rights for any attorney charged with other than conviction of an offense involving moral turpitude. However, read literally, it indicates (1) that disciplinary proceedings may be initiated only by the filing in this court of written charges under oath [which is inconsistent with §§ 7(1) and (2) of our Rule XI], and (2) that this court shall itself conduct disciplinary hearings. Unquestionably the caseload of this court would preclude such a role for us; it is necessary for us to turn to the bar for structured disciplinary proceeding assistance.

## II

As this court prepared to undertake its new disciplinary responsibilities, it received assistance both from a committee of the long-established Bar Association of the District of Columbia and from a committee of the new District of Columbia Bar (unified) for recommendations as to disciplinary rules. In the meantime, the American Bar Association's Standing Committee on Professional Discipline had drafted a set of model disciplinary rules.[2] It is important to recognize that the ABA's Standing Committee was preparing model rules adaptable for use in any state; those rules were not drafted in contemplation of the provisions of a statute such as § 11–2503 of our Code, by which the very legislature—the Congress of the United States—which created this court and set forth its disciplinary powers also enacted specific provisions which in part are inconsistent with the ABA's model rules.

In considering what rules to adopt in 1971, this court (of which, like Chief Judge NEWMAN and Judges MACK and FERREN, I was not then a member) was faced with the inconsistencies between the broad grants of power contained in §§ 11–2501(a) and 11–2502 on the one hand, and the restrictive provisions set forth in § 11–2503 on the other. In characterizing the provisions of the new § 11–2503 as restrictive, I do so advisedly, for court reorganization brought with it two significant statutory changes from the former § 11–2103 of the 1967 edition of the District of Columbia Code which was operative on the United States District Court. First, the prior statute had no mandatory suspension provision, while the new § 11–2503(a) provides that when a member of our bar has been convicted "of an offense involving moral turpitude," then "the court shall, pending final determina-

---

**2.** At that time, the ABA committee's model rules had not yet received formal ABA approval. Later they did, and they have proved to be extremely helpful. They first were issued as

"Suggested Guidelines for Rules of Disciplinary Enforcement" bearing the date November 14, 1974; the most recently amended edition is dated June 9, 1977.

tion of an appeal from the conviction, suspend the member of the bar from practice." Second, the prior statute made disbarment discretionary ("the name of the member so convicted may . . . be struck from the roll of the members of the bar"), while the new § 11–2503(a) makes disbarment mandatory for conviction of an offense involving moral turpitude. Also, it should be noted that while § 21(2) of our Rule XI permits an application for reinstatement five years after a disbarment, disbarment under the statute (either the former § 11–2103 or the new § 11–2503) connotes permanence: ". . . he shall thereafter cease to be a member." [3]

When the point of decision was reached as to the adoption of disciplinary rules, the court chose the ABA's model rules (with certain modifications thereof), which have provided both thorough guidance and a desired flexibility. The court did not specifically discuss § 11–2503; that statute's objectives readily could be considered to be subsumed by (1) the broad authority specifically granted by Congress in §§ 11–2501(a) and 11–2502 (including § 11–2502's provision for us to "censure, suspend from, or expel a member of [our] bar for crime . . . ."), and (2) the inherent power possessed by the highest court of any jurisdiction to exercise disciplinary authority over attorneys admitted to practice within that jurisdiction. See D.C.Code 1973, § 11–102. On October 7, 1971, this court adopted a comprehensive set of rules (to become ef-

fective April 1, 1972) governing the bar of the District of Columbia—including, of course, the disciplinary rules set forth in Rule XI.

From this point on, I shall limit my discussion of the subject matter basically to the situation arising when an attorney has been found guilty of a criminal offense. Overriding the discussion which follows is one simple fact: From the time of the adoption of our disciplinary rules in 1971 until the majority disbarred Colson on the basis of the language of the latter portion of § 11–2503(a), that statute has not been relied upon by this court, by Bar Counsel, or by The Disciplinary Board (which was renamed the Board on Professional Responsibility in January 1978) in any disciplinary case—including this one.[4] In that connection, one point should be stressed. While I recognize that at least one of the court's newest judges may not have been aware of the existence of § 11–2503 prior to this case, I can state flatly that this court as an institution, Bar Counsel, and the Board as an institution long have been well aware of the problems presented by the inconsistencies between § 15 of our Rule XI and § 11–2503 of the Code—and, as would be expected, there has been careful dialogue on the subject between the court, Bar Counsel, and the Board.

In adopting in 1971 a set of rules for the handling of a disciplinary proceeding involving an attorney who has been convicted of a crime, this court established as § 15 of

---

**3.** The statute provides only one exception to the permanence of disbarment for conviction of an offense involving moral turpitude. The last sentence of § 11–2503(a) states: "Upon the granting of a pardon to a member so convicted, the court may vacate or modify the order of disbarment."

The statutory permanence of disbarment—in contradistinction to suspension—for conviction of an offense involving moral turpitude is consistent with prior case law during those years in which disbarment was discretionary. See, e. g., In re Quimby, 123 U.S.App.D.C. 273, 359 F.2d 257 (1966); In re Williams, 158 F.Supp. 279, 281 (D.D.C.1957) (three-judge court).

**4.** These words were wholly correct when first written. However, the refinement of multiple conflicting opinions—as has occurred in this case—consumes time. On January 23, 1979, a

division of this court (all of whose members—Chief Judge NEWMAN and Judges KELLY and KERN—are members of the majority in this case) issued an unpublished order in another disciplinary proceeding. In it, anticipating the new procedures as they were being incubated in this case, a suspension was ordered under § 15(1) of Rule XI [rather than under § 11–2503(a)]. The division further provided:

> [T]he Board on Professional Responsibility is directed to institute formal proceedings and specifically to review the elements of the crime for which Respondent was sentenced for the purpose of determining whether or not the crime involves moral turpitude within the meaning of D.C.Code § 11–2503(a). [In the Matter of Fodiman, No. S–55–78.]

Rule XI of our Rules Governing the Bar essentially the ABA's relevant model provisions. I quote in full the first six subsections of § 15 so that their lack of conformity with § 11–2503 readily may be recognized.

> Section 15. Attorneys Convicted of Serious Crimes
>
> (1) Upon the filing with the court of a certificate demonstrating that an attorney has been convicted of a serious crime as hereinafter defined, the court shall enter an order immediately suspending the attorney, whether the conviction resulted from a plea of guilty or nolo contendere or from a verdict after trial or otherwise, and regardless of the pendency of an appeal, pending final disposition of a disciplinary proceeding to be commenced upon such conviction.
>
> (2) The term "serious crime" shall include any felony and any lesser crime a necessary element of which, as determined by the statutory or common law definition of such crime, involves improper conduct as an attorney, interference with the administration of justice, false swearing, misrepresentation, fraud, wilful failure to file income tax returns, deceit, bribery, extortion, misappropriation, theft, or an attempt or a conspiracy or solicitation of another to commit a "serious crime."
>
> (3) A certificate of a conviction of an attorney for any crime shall be conclusive evidence of the commission of that crime in any disciplinary proceeding instituted against him based upon the conviction.
>
> (4) Upon the receipt of a certificate of conviction of an attorney for a serious crime, the court shall, in addition to suspending him in accordance with the provisions of (1) above, also refer the matter to The Board for the institution of a formal proceeding before a hearing committee, without any probable cause hearing before any inquiry committee, in which the sole issue to be determined shall be the extent of the final discipline to be imposed, provided that a disciplinary proceeding so instituted will not be brought to hearing until all appeals from the conviction are concluded.
>
> (5) Upon receipt of a certificate of a conviction of an attorney for a crime not constituting a serious crime, the court shall refer the matter to The Board for whatever action it may deem warranted, including the institution of an investigation by Bar Counsel, a probable cause hearing before an inquiry committee, or a formal proceeding before a hearing committee, provided, however, that the court may in its discretion make no reference with respect to convictions for minor offenses.
>
> (6) An attorney suspended under the provisions of (1) above will be reinstated immediately upon the filing of a certificate demonstrating that the underlying conviction for a serious crime has been reversed but the reinstatement will not terminate any formal proceeding then pending against the attorney, the disposition of which shall be determined by the hearing committee and The Board on the basis of the available evidence.

Thus, quite intentionally, and with no reference to § 11–2503, this court's evaluative criterion became that of a "serious crime," rather than § 11–2503(a)'s "offense involving moral turpitude." The court provided that when it found a crime to have been "serious," it would suspend an attorney and, under § 15(4) of Rule XI, "refer the matter to the Board for the institution of a formal proceeding before a hearing committee . . . in which the sole issue to be determined shall be the extent of the final discipline to be imposed . . ."

It should be recognized that the responsibility of professional discipline was new to this court and to those who thereafter became members of the disciplinary structure which we created as an arm of the court to administer the provisions of Rule XI.[5] As

---

**5.** The court's inexperience may provide the explanation for what I consider to have been a major error in the adoption of our rules. In appointing the members of our Board, we limit-

we have progressed, we have sought to develop consistent standards. Thus, in *In re Kleindienst*, D.C.App., 345 A.2d 146, 147 (1975) (en banc), we noted that "the nature of the discipline imposed is a judgment independently to be made by this court." In eschewing the concept that punishment is an objective of a disciplinary proceeding, we also observed:

> We start with a fundamental premise: The purpose of a disciplinary proceeding is to question the continued fitness of a lawyer to practice his profession. [*Id.*; citations omitted.]

The *Kleindienst* case produced a majority and a dissenting opinion, the latter written by Judge KELLY, the author of the majority opinion in this case. It also produced a separate opinion by Judge GALLAGHER stating why he voted to grant rehearing. 345 A.2d at 152. In none of those three opinions was § 11–2503 of the Code mentioned (quite properly, I hasten to add); all references were to the provisions of the Disciplinary Rules which the respondent was charged with having violated.

Judge KELLY had occasion to write an opinion for a division of the court in *In re Wild*, D.C.App., 361 A.2d 182 (1976). In a 2–1 opinion, the court adopted the recommendation of our former Disciplinary Board and suspended the respondent for one year. As had always been true, no mention was made of § 11–2503. At that time, Judge KELLY wrote in part:

> The Disciplinary Board found it unnecessary to determine whether respondent's [unlawful] conduct involved moral turpitude (DR1–102(A)(3)) or was prejudicial to the administration of justice within the meaning of DR1–102(A)(5) since it found a clear violation of DR1–102(A)(4) in respondent's secretly transferring funds of a Bahamian subsidiary of Gulf Oil Corporation to President Nixon's Reelection Committee and directing Maurice Stans to list the contributions as made by "employees of Gulf Corporation"—a patent effort to circumvent the law . . . . [*Id.*, at 183.]

Another case which should be noted is *In re Foshee*, No. S–48–77. That respondent was found to have engaged in illegal conduct involving moral turpitude, but there had been no suspension pending a disciplinary hearing, there was no reliance upon (or even mention of) § 11–2503(a), and there was no automatic disbarment as the majority now says that statute requires. Rather, the evaluation of that respondent's conduct was keyed to his violation of Disciplinary Rule 1–102(A)(3).[6] By an unpublished Memorandum Opinion and Order issued March 17, 1977, we adopted the recommendation of The Disciplinary Board that the respondent be suspended for three months.[7]

---

ed ourselves in § 4(1) of Rule XI to selecting such Board members from a list of not less than three candidates per vacancy submitted to us by the Board of Governors of the District of Columbia Bar. (This provision was not adopted from the model rules, but rather was accepted as a recommendation from the District of Columbia Bar.) Indicative of the lack of wisdom of such a provision is the fact that no other court in the country has similarly limited itself.

We have been fortunate in that our Board has had two distinguished Chairmen and many able and dedicated members. (Also, the Board selected a highly able Bar Counsel.) Nonetheless, countless hours have been spent fruitlessly in our considering the qualifications of many nominees who are unknown to us. We properly have total discretion in naming the members of our Committee on Admissions, our Committee on Unauthorized Practice, and the trustees of the Clients' Security Trust Fund. I firmly believe we should have similar discretion with respect to selecting the members of our Board on Professional Responsibility, which probably is the most sensitive arm of the court. A majority of the court, however, thus far has been unwilling to rectify this problem.

**6.** Disciplinary Rule 1–102(A)(3) provides in relevant part:

"A lawyer shall not: . . . Engage in illegal conduct involving moral turpitude."

**7.** The *Foshee* case received the careful attention of the full court. The division which was assigned to the case prepared and circulated a draft opinion for intended publication. The court voted sua sponte to consider the case en banc. The division then concluded that disposition of the case by an unpublished Memorandum Opinion and Judgment would permit its prompt resolution. That approach proved acceptable to the en banc court, which returned the case to the division for decision.

During the early years of our exercise of responsibility over the bar, it became apparent that various aspects of our rules needed refinement, improvement, and supplementation. In the meantime, the American Bar Association's Standing Committee on Professional Discipline continued its outstanding work in the field, and it effected further improvements in its model disciplinary rules. In 1977, we undertook to make changes in our rules. At our invitation, the Disciplinary Board suggested various improvements; the Board of Governors of the District of Columbia Bar also gave us recommendations.

By the end of 1977, this court included among its nine active judges four persons who had not participated in the adoption of the original rules on October 7, 1971. If the court as an institution somehow had erred in subordinating § 11–2503(a) in promulgating the original rules, consideration of major amendments to those rules presented an ideal opportunity to revitalize that statute. No such thing happened; when we amended the rules on January 12, 1978, § 15 of Rule XI was unanimously readopted with no relevant change.[8]

### III

The foregoing recitation has been necessary to place in context one question with which I deal: Why has the majority turned to one portion of § 11–2503(a), which unquestionably this court had subordinated to the more comprehensive and flexible provisions of §§ 11–2501(a) and 11–2502 of the Code and § 15 of our Rule XI, to lead to the result of disbarment for respondent Colson? It is likely that the answer is found in the following new provision of § 7(3) of Rule XI which was adopted in January of 1978 (over Judge NEBEKER's and my opposition):

> In considering the appropriate [final disciplinary] order, the Court shall accept the findings of fact made by the Board

unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted.

I feel strongly—and I believe my view is shared by the great majority of persons who are knowledgeable in the field of professional discipline—that the basic decisional responsibility for the sanction to be imposed in a disciplinary proceeding should rest upon the judges of a jurisdiction's highest court, rather than upon the members of a court-created disciplinary body.[9] After all, our Board on Professional Responsibility is not akin to an administrative agency which is presumed to have an expertise which we lack; we should be quite as capable in this area as our appointed Board members, and we should be free of even the hint of potential peer pressures which might make a particular respondent feel that he or she can receive impartial consideration only from judicial officers.

Nonetheless, the majority of my colleagues effectively concluded to the contrary. For reasons which remain inexplicable to me, this court, in adopting the above-quoted provision, has conferred what amounts to a quasi-agency status upon the Board which we have created and whose members we appoint.

While I disagree with the adoption of such a provision, I recognize that differences of opinion make, among other things, horse races and dissenting opinions. However, this case came along soon thereafter, and the majority promptly found itself confronted by its new creation.

On October 19, 1977 (while we were actively considering changes in our rules), the Board issued its Findings and Recommendations in this case. The Board then had seven members. Four concluded that a

---

8. The only meaningful change in § 15 of Rule XI was the deletion of references to inquiry committees, which previously were part of our disciplinary structure but which we decided were no longer necessary.

9. I believe this to be particularly true where, as is now the case in the District of Columbia, the disciplinary body includes members who are not lawyers.

five-year suspension would be the appropriate disciplinary sanction; three voted for disbarment. Neither the majority nor the minority opinion of the Board made any reference to § 11–2503(a) of the Code; both dealt with the appropriate consequences of what had been concluded to be Colson's violations of Disciplinary Rules 1–102(A)(3) and 1–102(A)(5).

Bar Counsel and respondent Colson then filed a joint motion to dispense with briefs and oral argument in this court, urging us to "enter an Order [of suspension] in conformity with the recommendation of the Board." [10] The court then concluded that the Board's minority position advocating disbarment needed exposition beyond that which already was apparent from the record. Accordingly, the court appointed a distinguished member of the bar, John W. Douglas, as amicus curiae to represent the position of the Board's minority (i. e., to advocate disbarment). [11] In his brief, Mr. Douglas referred to the statute in a limited fashion as follows:

> Imposition of the disbarment sanction under the Court's Rule XI, Section 15, would also be consistent with Section 11–2503(a) of the District of Columbia Code, dealing with the discipline of attorneys convicted of crimes. That section provides for the removal of members of the Bar for any "offense involving moral turpitude." In view of the fact that disbarment here would be consistent with Section 11–2503(a), we see no useful purpose in considering the question, not raised below, of whether the Court is compelled by Section 11–2503(a) to automatically disbar an attorney, such as respondent,

for any crime involving moral turpitude—even though we recognize that the literal language of the statute could support such a conclusion.

In due course, the case was argued before the court en banc, and the majority has rejected the Board's suspension recommendation by stating simplistically: "Because of legislative fiat, however, we are precluded from adopting The Board's recommendation." At 1163.

A reader with little prior exposure to disciplinary matters might well conclude that the Board must have been rather obtuse to overlook such a seemingly obvious point. However, there was no reason for the Board to have considered § 11–2503(a) of the Code to be controlling. As I have stated, we have never even cited it in any case previously. Moreover, we did not rely upon its provisions in this case until reaching a final decision. That is, we did not initiate this proceeding by suspending Colson under § 11–2503(a) for having committed an offense involving moral turpitude (which, under the statute, thereafter would call for automatic disbarment); we suspended him under § 15(1) of Rule XI and directed the Board to initiate a proceeding under § 15(4) "in which the sole issue to be determined shall be the extent of the final discipline to be imposed . . . ." If § 11–2503(a) is to be followed, a precondition to its applicability is a determination by this court that a member of the bar has been "convicted of an offense involving moral turpitude." We made no such finding; rather, as noted, our suspension order and the direction to hold a disciplinary hearing were predicated exclusively on § 15 of Rule XI.

---

**10.** Bar Counsel and counsel for Colson filed a stipulation which reads as follows:

> It is hereby stipulated and agreed by and between Bar Counsel and Counsel for Respondent that each is satisfied with the recommendation of the Disciplinary Board herein, and that neither intends to further contest or seek modification of the recommendation.

**11.** There was somewhat of a temporal overlap in our consideration of this particular case and of our overall rule changes. Mr. Douglas was appointed to urge disbarment on November 30, 1977. The revised § 8 of Rule XI which was

adopted on January 12, 1978, included the following new provision:

> Whenever at least two members of the Board recommend disbarment, the case shall be referred initially to the court en banc. Additionally, since Bar Counsel appears before the Court on behalf of the Board, in a case in which two or more members of the Board recommend a discipline other than that recommended by the majority of the Board, the Court in its discretion may appoint an attorney to advocate the minority view.

## IV

Wisely, courts seldom decide cases on grounds not urged or briefed by the parties. When they do, they risk going astray, and that is precisely what has happened here.

It would be one thing if the majority were to have said candidly, in effect, (1) that this court no longer will operate under the premise that the objectives of § 11–2503 properly may be considered to be subsumed within the broader grants of statutory authority (*i. e.*, §§ 11–2501 and 11–2502) and to be satisfied by the provisions of our Rule XI, and (2) that inasmuch as ours is an Article I court, Congress is free to direct (without a separation of powers problem) that an attorney who has been convicted of an offense involving moral turpitude must thereupon be suspended by this court and thereafter (following affirmance in any appeal) shall cease—permanently—to be a member of our bar.

The majority does not take such an approach. Rather, it indulges the fiction that § 15 of Rule XI is readily compatible with § 11–2503(a). It effects major surgery upon our disciplinary procedures, but seeks at the same time to assure the patient that there is nothing wrong. In the process, in my view, the majority wreaks considerable hovac upon the orderly functioning of the Board on Professional Responsibility and its hearing committees. The majority opinion does not provide guidance; it creates confusion. Illustratively, the statute calls for disbarment upon conviction of "an offense involving moral turpitude." Without any basis in either legislative history (there is none) or reason, the majority jumps from that provision to the following interconnected conclusions:

An attorney is subject to disbarment under the statute for his *conviction of a crime* involving moral turpitude, not for his *commission of an act* involving moral turpitude. The threshold focus of the statute, then, is on the *type* of crime committed rather than on the factual context surrounding the actual commission of the offense. The Board, therefore, must make an initial determination as to whether the attorney's crime inherently involves moral turpitude. If The Board decides that it does, that is the end of the inquiry; The Board must recommend disbarment. [*Ante,* at 1164 (emphasis in original).]

I have studied the majority opinion many times in vain seeking to find a coherent thread of consistency which adequately might guide our appointed Board in future cases.[12] To back up to the threshold of the applicability of § 11–2503(a), if the statute is to be applied, then it is we who must make a determination of moral turpitude prior to suspension, which would leave nothing (other than confirming the fact of conviction) to be determined by the Board.[13] Further, although the statute quite clearly relates disbarment to conviction of an "offense involving moral turpitude," the majority opinion essentially translates such language into requiring a determination based solely on the language of the relevant criminal statute, without regard to any mitigating circumstances concerning the commission of the violation thereof. Here too there is uncertainty, for the majority also takes the position that some cases will require precisely the type of analysis which is rejected in this case. *See* 412 A.2d at 1166, 1167.

An overview of the disposition of this case, as I see it, finds the majority seeing no constitutional infirmities in § 11–2503(a),

---

12. It risks repeating the obvious, for example, to note that while § 11–2503(a) speaks in terms of "an offense involving moral turpitude," the majority opinion draws its distinction between "conviction of a crime involving moral turpitude" and the "commission of an act involving moral turpitude." Others who find this less than clear will not stand alone.

13. This presents due process problems for the majority, whose discussion on this subject ranges from an attorney's right to a full hearing as to whether the elements of a particular crime "inherently" involve moral turpitude to the far lesser concept that an attorney's criminal trial, plus his right to contest the fact that he has been convicted, provide all the due process to which he is entitled. *See* 412 A.2d at 1164 1169.

and yet applying only that portion of it which leads to the disbarment of respondent Colson. I cannot acquiesce in either such a selective utilization of the statute or what I consider to be the shoehorning of a single provision of the statute into a complex disciplinary mechanism (our Rule XI) which was neither drafted nor adopted with any directly intended interconnection with § 11–2503(a).

## V

Like the majority, I express no independently-reached judgment as to whether respondent Colson should be suspended or disbarred. The factors which led him to commit the acts under consideration are exceptionally unique and complex. Recognizing, as I have quoted above from our en banc opinion in *In re Kleindienst, supra,* that "[t]he purpose of a disciplinary proceeding is to question the continued fitness of a lawyer to practice his profession" [345 A.2d at 147 (citations omitted)], the underlying question of the appropriate discipline is a difficult one—particularly when one recognizes our manifest obligation to disregard any and all political overtones of Colson's conduct.

I have expressed my disagreement with what I consider to have been my colleagues' unwise abdication of too much of our decisional responsibility to the Board; as noted we have committed ourselves under the new § 7(3) of Rule XI to "adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." Under that standard of review, I could not say—nor do I believe the members of the majority validly could say—that the suspension recommendation of the Board's majority should be rejected.

However, the majority does not apply the review standard which its members so recently adopted. Rather, it decides this case on the basis of one portion of § 11–2503(a), notwithstanding the unquestioned facts that (1) this court has never applied § 11–2503(a) to any disciplinary respondent previously, (2) the court made no prior reference whatsoever to § 11–2503(a) in this proceeding, (3) neither the majority nor the minority of the Board placed any reliance on the statute, and (4) no party to this proceeding has advanced the applicability of § 11–2503(a). I believe that the majority's singling out of respondent Colson for disbarment under a statutory provision never before utilized by this court presents a serious question as to whether due process requirements have been met. Additionally, because of my deep concern as to the adverse precedential consequences which will follow from what I consider to be the majority's unsound analysis of the issues, I respectfully express these dissenting views.

Before NEWMAN, Chief Judge, and KELLY, KERN, GALLAGHER, NEBEKER, HARRIS, MACK and FERREN, Associate Judges, and YEAGLEY, Associate Judge, Retired.*

Statement by Associate Judge KERN, with whom Associate Judge KELLY, and Associate Judge YEAGLEY, Retired, join:

The dissent, distilled to its essence, complains that in the instant case the majority of the court, sitting en banc, has recognized, read and applied the particular section of the District of Columbia Court Reform and Criminal Procedure Act of 1970, § 11–2503(a), enacted by Congress to deal with the situation "when a member of the bar . . . is convicted of an offense involving moral turpitude."[1] The dissenters decry (Dissent at 1178) "such a selective utilization of the statute . . . [and] the shoehorning of a single provision of the

---

\* Judge Yeagley was an Associate Judge of this court at the time of oral argument; his status changed to Associate Judge, Retired, on April 20, 1979.

1. Section 2503(a) mandates disbarment of a lawyer so convicted and the record reflects that

subsequent to this enactment the member of the bar here pleaded guilty to the charge of "obstructing justice in connection with the criminal prosecution" of another, in violation of 18 U.S.C. § 1503.

statute into a complex disciplinary mechanism (our Rule XI) which was neither drafted nor adopted with any directly intended interconnection with § 11–2503(a)."

If this court failed to apply the law as written by Congress, then this failure would indeed, constitute "a selective utilization of the statute." So, too, rules of this court, however drafted and adopted, surely do not take precedence over a congressional mandate. In sum, the member of the bar before us falls within the applicable statute and we are duty-bound to abide by the law as found in this statute.

FERREN, Associate Judge, with whom NEWMAN, Chief Judge, and MACK, Associate Judge, join, concurring:

Judge KELLY'S opinion for the majority holds that if a lawyer commits a criminal offense involving "moral turpitude" (as determined by specified procedures), then D.C.Code 1973, § 11–2503(a), mandates disbarment, despite the more flexible provisions of disciplinary Rule XI (1979). Thus, to the extent that Rule XI conflicts with § 11–2503(a), the rule must yield to the statute.

Our dissenting colleagues question the very premise of the majority opinion. They suggest that this court, at the time it created a disciplinary system under Rule XI of the Rules Governing the Bar, implicitly decided that § 11–2503(a) need not be taken literally—that under the broad authority of D.C.Code 1973, §§ 11–2501 and 11–2502, this court properly adopted, by court rule, the full range of disciplinary sanctions for a lawyer convicted of a crime, whether it involved moral turpitude or not. Thus, Rule XI is the exclusive guide for lawyer discipline; § 11–2503(a) must be ignored in favor of a lawful, preemptive court rule.

The dissenters argue, second, that Rule XI and § 11–2503(a) are manifestly incompatible. They suggest that this reflects, in an objective way, not only that the court originally intended to discard the statute but also that the majority, in applying it now to Colson, has "wreak[ed] considerable havoc upon the orderly functioning" of the disciplinary system. (Dissent at 1178.)

Finally, the dissenters maintain that disbarment of Colson under § 11–2503(a) presents, in any event, "a serious question as to whether due process requirements have been met," since this court has never applied that statute in a previous disciplinary proceeding, and no party has relied on it in this one. (Dissent at 1177.)

In view of this broadside against the majority's analysis, I believe a further explanation should be offered to demonstrate why, in my judgment, the dissent altogether lacks force.

## I.

First, for reference, I set forth those portions of the dissent which appear to bear most directly on the first issue, the relationship between the statute and Rule XI.

In considering what rules to adopt in 1971, this court (of which, like *Chief Judge* NEWMAN and *Judges* MACK and FERREN, I was not then a member) was faced with the inconsistencies between the broad grants of power contained in §§ 11–2501(a) and 11–2502 on the one hand, and the restrictive provisions set forth in § 11–2503 on the other. [Dissent at 1163.]

\* \* \* \* \* \*

When the point of decision was reached as to the adoption of disciplinary rules, the court chose the ABA's model rules (with certain modifications thereof), which have provided both thorough guidance and a desired flexibility. The court did not specifically discuss § 11–2503; that statute's objectives readily could be considered to be subsumed by (1) the broad authority specifically granted by Congress in §§ 11–2501(a) and 11–2502 (including § 11–2502's provision for us to "censure, suspend from, or expel a member of [our] bar for crime . . . ."), and (2) the inherent power possessed by the highest court of any jurisdiction to exercise disciplinary authority over attorneys admitted to practice within that jurisdiction. *See* D.C.Code 1973, § 11–102. [Dissent at 1172.]

\* \* \* \* \* \*

While I recognize that at least one of the court's newest judges may not have been aware of the existence of § 11–2503 prior to this case, I can state flatly that this court as an institution, Bar Counsel, and the Board as an institution long have been well aware of the problems presented by the inconsistencies between § 15 of our Rule XI and § 11–2503 of the Code—and, as would be expected, there has been careful dialogue on the subject between the court, Bar Counsel, and the Board. [Dissent at 1172.]

These assertions suggest several questions: (1) Do §§ 11–2501(a) and 11–2502 provide authority for rejecting § 11–2503(a)? (2) Whatever the majority view on that question is today, did this court, in adopting Rule XI in 1971, reject § 11–2503(a)? (3) If not, did this court reject § 11–2503(a) sometime later, in a disciplinary proceeding or otherwise?

A. As to the first question, the dissenters assert that § 11–2503(a) can be "subordinated" to or "subsumed" by §§ 11–2501 and 11–2502. Thus, they say, by authority of these other, more general statutory provisions, Rule XI is paramount to § 11–2503(a). I disagree. There is no doctrine of "subordination" or "subsumption" which would authorize this court to ignore the clear, specific words of § 11–2503(a) in favor of the more general regulatory authority over membership in the bar set forth in §§ 11–2501 and 11–2502. The very specificity of § 11–2503 implies a limitation on this court's general authority under the two preceding sections of the Code.

Basically, what divides the court here is that the majority finds no legitimate basis for ignoring § 11–2503(a) whereas the dissenters conclude that the general powers granted under §§ 11–2501 and 11–2502 are sufficient to justify the court's blinking at the next section of the statute in favor of the nicely symmetrical, Rule XI disciplinary procedure recommended by the ABA. I do not believe this court can so easily ignore an express act of Congress.[1]

In holding that Rule XI is limited by § 11–2503(a), the majority acknowledges that when a lawyer is charged with committing a serious criminal offense, there will be a more complex relationship between court and Board than there would be under Rule XI alone. *See, e. g.,* 412 A.2d at 1165 n. 10. But, short of an amendment to the statute or a rewriting of the rule, the procedure spelled out by Judge KELLY for the majority is the one which must be followed.

This legal confirmation of the vitality of § 11–2503(a) is enough to sustain the majority position. The dissent, however, makes factual assertions which suggest that this court is reversing a previously-announced view. If we were doing so, I would be concerned about applying a statute which Colson had legitimate reason to believe the court had officially rejected. We would have to consider seriously whether the better course would be to confirm the authority of § 11–2503(a) prospectively and apply Rule XI to Colson.[2] Accordingly, I feel

---

1. As the dissenting opinion points out, this court was created under Article I, § 8 of the Constitution. Thus, the question whether Congress, rather than this court, has ultimate authority over the practice of law in the District of Columbia arguably raises less of a "separation of powers" problem than there might be were this court created under Article III—or under a separate judicial article of a state constitution. For this reason, I am satisfied not to consider *sua sponte* the question whether § 11–2503(a), to the extent of requiring mandatory disbarment, is "constitutional." As indicated later in Part II, a different constitutional question is raised if § 11–2503(a) were construed to require permanent disbarment, *i. e.,* expulsion without prospect for reinstatement, upon conviction of a moral turpitude crime.

2. The significance of applying the statute instead of the rule at this point in time is potentially twofold. First, Rule XI does not necessarily require disbarment for a crime involving moral turpitude. *See id.,* §§ 3, 15(4). Second, Rule XI, § 21(2) permits application for reinstatement five years after disbarment, whereas there is an open question whether disbarment under § 11–2503(a) permits reinstatement—an issue to be considered by the en banc court this fall in the case of *In re Elaine Kerr,* No. D–18–77. Thus, if Rule XI, not the statute, were to be applied in Colson's case, the question would remain open as to whether he would be entitled *to apply for reinstatement under the rule,* irrespective of our eventual disposition of the reinstatement question under the statute.

obliged to deal with the dissenters' statement that there has been "institutional" communication about this subject among the court, Bar Counsel, and the Board, and that the court is therefore "disingenuous" in applying § 11–2503(a) to Colson.

B. When one carefully reads the dissent, especially the passages quoted above, it is apparent that the dissenters never state that this court actually focused on § 11–2503(a) in 1971, at the time Rule XI was adopted. All their assertions are compatible with the view that the court simply overlooked § 11–2503(a) while focusing on the comprehensive draft model rules of the American Bar Association Standing Committee on Professional Discipline. But whatever the truth may be—whether the court was aware of § 11–2503(a) at the time of adopting Rule XI, or learned about the inconsistency sometime later—that fact is legally irrelevant unless this court, in adopting Rule XI or otherwise, can be said to have *officially* rejected § 11–2503(a). This brings us, then, to the dissenters' statement that this court "as an institution" took up the matter at some point with Bar Counsel and the Board "as an institution."

As I can best determine, there was no formal exchange of views between court and Board, for I can find no record of correspondence, memoranda, or minutes which could be considered an official pronouncement of this court, equivalent to an advisory opinion. Nor can I find any tangible evidence of even an informal pronouncement of some sort. Furthermore, even if one or more members of the court had discussions amounting to a "careful dialogue on the subject between the court, Bar Counsel, and the Board" (dissent at 1172), such an informal, private colloquy cannot serve as a proper basis for asserting that a provision of the District of Columbia Code has been officially scrapped.[3] I therefore conclude that any attitude of forbearance toward enforcement of § 11–2503(a) which this court may have communicated to the Board can have no legal consequence. An informal policy of forbearance is not tantamount to repeal of a statute.

C. There remains the question whether this court has acted in some other, official way which manifests a rejection of § 11–2503(a). The answer is no. This court has not formally confronted and officially rejected § 11–2503(a) at any time after adoption of Rule XI in 1971.

As the disciplinary system has evolved, the Board, initially through its committees, has considered all "serious crime" cases and made recommendations to this court. *See* Rule XI, § 15. In some, the Board has concluded that there were ethical violations on grounds other than a finding of moral turpitude. It has based its recommendations accordingly. In others, the Board has found moral turpitude and recommended disbarment. In only one instance prior to the present case has this court considered a "serious crime" involving moral turpitude without an accompanying recommendation of disbarment—an instance in which § 11–2503(a) was not suggested to the court, and in which a three-judge division issued an unpublished three-month suspension order lacking precedential significance.[4] Simply

---

**3.** I was a member of the Disciplinary Board (now Board on Professional Responsibility) during its first four years, 1972–76. I do not recall participating in or learning about any such discussion, but because memory fades I am willing to assume that one or more took place.

**4.** To reinforce their point that § 11–2503(a) should not be applied, our dissenting colleagues stress that three disciplinary cases decided by this court did not mention the statute. The first two cases, however, *In the Matter of Wild*, D.C.App., 361 A.2d 182 (1976) and *In the Matter of Kleindienst*, D.C.App., 345 A.2d 146 (1975) (en banc) (per curiam) did not involve

"moral turpitude" crimes. Thus, there was no reason for the court to discuss § 11–2503(a).

In the third case, *In the Matter of Foshee*, No. S–48–77 (unpublished), this court did find violations of DR 1–102(A)(3), proscribing "illegal conduct involving moral turpitude," as well as DR 1–102(A)(4), prohibiting "conduct involving dishonesty, fraud, deceit, or misrepresentation." The court accepted the Board's recommendation of a three-month suspension without reference to § 11–2503(a). The three-judge division of this court issuing the *Foshee* order was comprised of former Chief Judge Reilly and Associate Judges Nebeker and Harris.

put, there is no other basis for saying that this court has rejected § 11–2503(a) at any time after adoption of Rule XI.

Clearly, therefore, the dissenters' first argument has no force. The provisions of D.C.Code 1973, §§ 11–2501(2), 11–2502 do not authorize rejection of § 11–2503(a); but in any event, it is incorrect to suggest that the court, prior to this case, has officially addressed that issue.

## II.

The dissenters' second charge is that Rule XI and § 11–2503(a) are manifestly incompatible, and that the majority accordingly has "wreak[ed] considerable havoc" upon the disciplinary system.[5]

It is important to note first, for perspective, that this court adopted a more pervasive interim suspension rule than § 11–2503(a) expressly requires. Rule XI, § 15 provides for immediate suspension by the court upon conviction of any "serious crime"—a term including all felonies and

other specified crimes reflecting adversely on a lawyer's fitness to practice law. *See* Rule XI, § 15(2). As a result, the "serious crime" category includes all crimes potentially calling for a finding of moral turpitude—and others. Thus, Rule XI, § 15 is broader than § 11–2503(a); it provides as well for immediate suspension for some crimes cognizable under § 11–2503(b).[6] The dissenters accept this.

Next, Rule XI, § 15(4) provides that upon a lawyer's initial suspension for a serious crime, the certificate of conviction shall be forwarded to the Board for institution of formal disciplinary proceedings. If the conviction becomes final, those proceedings shall be confined to one issue: "the nature of the final discipline to be imposed." *Id.* Under this system, therefore, if the Board concludes that the crime involved moral turpitude, we hold in *Colson* that the Board must call for disbarment. D.C.Code 1973, § 11–2503(a). Otherwise, the Board has the full range of sanctions to recommend. D.C. Code 1973, § 11–2503(b); *see* Rule XI, § 3.[7]

---

In an effort to enhance the significance of *Foshee, supra,* the dissenters assert, at their note 7, that "[t]he *Foshee* case received the careful attention of the full court," having "voted sua sponte to consider the case en banc" after the division had circulated to the full court "a draft opinion for intended publication." Subsequently, according to the dissenters, the en banc court returned the case to the division for disposition without publication. The dissenters suggest that these events manifest the full court's affirmative approval of *Foshee, supra.* That may—or may not—be the case. Sometimes, a vote sua sponte to go en banc prior to issuance of a division opinion about to be published signals that a majority of the full court tentatively disagrees with the division in one or more significant respects. *See, e. g., Gorham v. United States,* D.C.App., 339 A.2d 401 (1975). Thus, by interdicting the intended publication of *Foshee, supra* and permitting its issuance only as an unpublished Memorandum Opinion and Judgment, with diminished precedential significance, the en banc court cannot, in fairness, be said to have manifested unquestioned approval of that opinion, let alone given forthright consideration to § 11–2503(a), which was not cited by the division.

- 5. This argument apparently is advanced for two purposes: to supply objective evidence that the court rejected § 11–2503(a) in adopting Rule XI, and to show that the majority's use of

the rule to implement the statute is unworkable. Because the legal irrelevance of the first point is discussed in Part I, *supra,* I will deal here only with the functional relationship between the statute and the rule.

6. This broader immediate suspension provision *is justified under D.C.Code 1973, §§ 11–2501 and 11–2502 granting this court overall authority to regulate the practice of law, for it does not derogate from any express requirement of § 11–2503.*

7. Rule XI, § 3, "Types of Discipline," provides in part as follows:

> Misconduct shall be grounds for:
> (1) Disbarment by the Court; or
> (2) Suspension by the Court . . . [not] in excess of five years; or
> (3) Temporary Suspension by the Court . . . ; or
> (4) Censure by the Court; or
> (5) Reprimand by the Board on Professional Responsibility; or
> (6) Informal admonition by Bar Counsel; or
> (7) Probation by the Court in conjunction with or in lieu of other discipline.

Without doubt, the legal situation would be clearer if mandatory disbarment for moral turpitude crimes had been specifically incorporated into the disciplinary rules, tracking § 11–2503(a). In creating a "serious crimes" catego-

Inherent in implementing § 11–2503, of course, is the need to establish a procedure for making the "moral turpitude" inquiry in a given case. As indicated by the broader, "serious crime" category in Rule XI, § 15(2), this court does not limit immediate suspension to lawyers convicted of offenses involving moral turpitude; but, of equal importance, the court does not label any offense as one of "moral turpitude," even tentatively, until that question can be explored on a case-by-case basis, beginning with hearings before a Board committee and then the Board itself. The dissenters acknowledge, in fact, that "[a]n attorney's right to practice his profession obviously is a valued one, which may not be taken away without proper notice and a fair hearing." (Dissent at 1171.) Accordingly, Rule XI, § 15 provides a mechanism which can be used to accomplish the purposes of § 11–2503(a), consistent with due process: (1) immediate, interim suspension for "serious crimes" (including all those likely to involve moral turpitude), coupled with (2) disbarment upon final conviction of an offense involving "moral turpitude," determined to be such after proper hearings before a Board committee, the Board itself, and then this court.

The dissenters, nonetheless, fault this analysis because of two alleged inconsistencies between § 11–2503(a) and Rule XI. First, they reject the majority's position that Rule XI, § 15 can be used to provide due process elaboration on § 11–2503(a). They assert that "if the statute is to be applied, then it is we [the court] who must make a determination of moral turpitude

prior to suspension, which would leave nothing (other than confirming the fact of conviction) to be determined by the Board." (Dissent at 1177.) I do not understand that statement. As long as this court makes the ultimate determination, there is no reason why we cannot, consistent with the statute, invite the Board, as an arm of the court, to develop the record at a fair hearing and make a recommendation with respect to moral turpitude. Especially for crimes which, on their facts, may involve moral turpitude but are not such *per se*,[8] there is no way that this court can conduct hearings on moral turpitude before suspension; indeed, the dissenters acknowledge as much when stating, with reference to disciplinary hearings generally, that "[u]nquestionably the caseload of this court would preclude such a role for us." (Dissent at 1171.) Therefore, unless we limit offenses involving moral turpitude to *per se* categories, which would unduly narrow the statute, the Board's role is indispensable, not merely desirable. If Rule XI did not exist, we would have to adopt such provisions to implement § 11–2503(a).

Second, the dissenters claim that § 11–2503(a) is inconsistent with Rule XI because it "connotes permanence" (dissent at 1172), contrary to Rule XI, § 21(2) permitting application for reinstatement five years after disbarment. This point is unpersuasive, however, for several reasons. The § 11–2503(a) requirement that a lawyer convicted of a crime involving moral turpitude "shall be struck from the roll of the members of

---

ry broader than moral turpitude crimes, and thereby requiring immediate suspension for a broader range of offenses than required by § 11–2503(a), the court failed to deal expressly with the narrower range of offenses mandating eventual disbarment under § 11–2503(a). As indicated earlier, however, this failure may have been caused by the court's overlooking § 11–2503(a) when it adopted Rule XI, not by a conscious rejection of that statute.

8. As stated in the majority opinion, we perceive two categories of crimes involving moral turpitude: those which are such *per se* and those which are such, in a given case, only because of the underlying facts. As to the

former, we hold in this case that once this court has made such a determination, after considering the Board recommendation, the Board's hearing role will be limited in future cases of the same crime to confirming whether the record establishes the conviction. As indicated in the majority opinion at 1165 n.8, we believe that due process is satisfied by this evolutionary process toward a determination of *per se* moral turpitude crimes. All the more so, due process is preserved through the case-by-case approach, with the Board's help, to all other determinations that a respondent's criminal conviction reflects moral turpitude.

the bar and . . . thereafter cease to be a member" does not necessarily imply that such expulsion must be permanent.[9] Even if it does, the constitutionality of such a result would have to be considered. Finally, if permanent disbarment were constitutional, we obviously would have to reconsider our reinstatement rule in light of the statute. In any event, the question of reinstatement is not before us in this case. *See* note 2 *supra.* I see no legitimate reason to ignore the statute simply because of speculation about a related but analytically severable issue.

In summary, recognizing that any disciplinary system should be designed in a way that assures due process, this court has initiated a system which hopefully guarantees a lawyer's constitutional rights in all situations. I do not understand how the court's desire to protect constitutional rights can properly lead the dissenters to conclude that Rule XI, § 15 is wholly inconsistent with § 11–2503(a), with the result that the court must choose between the rule and the statute. The statute is there, necessarily to be implemented by procedurally fair rules.[10] Judge KELLY's opinion so provides. Accordingly, there is no manifest incompatibility between § 11–2503(a) and Rule XI.

### III.

A few words should be added, finally, about the dissenters' argument that the court should not consider § 11–2503(a) in *Colson's* case because the proponents of disbarment have not relied on it—presenting a "serious question" of due process.

Rather than accept the majority's good faith, the dissenters accuse us of revitalizing § 11–2503(a) solely to circumvent the recent amendment of the disciplinary rules providing that the court shall adopt the disposition recommended by the Board (in Colson's case a five-year suspension), "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or otherwise would be unwarranted." Rule XI, § 7(3), as amended. This accusation is not well-founded.

While not premising his advocacy on the statute, Mr. Douglas, as amicus curiae, called the statute to the court's attention in his brief. If, as the dissenters claim, there is a prevailing assumption that this court, in adopting Rule XI, discarded the mandatory disbarment aspect of § 11–2503(a), then we are duty-bound, in supervising the disciplinary system, to face up to that assumption by deciding forthrightly whether the statute applies or not. We cannot ingenuously ignore it.[11]

**9.** *The cases cited by the dissenters,* In re Quimby, *123 U.S.App.D.C. 273, 359 F.2d 257 (1966) (per curiam), and* In the Matter of Williams, *158 F.Supp. 279 (D.D.C.1957) (per curiam),* aff'd per curiam, *D.C.Cir., 256 F.2d 888 (1958), do not hold that § 11–2503(a) or its predecessor statute make disbarment permanent.* Quimby *affirmed appellant's disbarment for embezzlement, while* Williams *merely denied a "Motion to Mitigate Punishment" brought by a lawyer who had been disbarred while his appeal of a forgery conviction was pending.*

*While the* Quimby *court characterized a suspension, in contrast with disbarment, as a "lesser disciplinary action" which "implies the likelihood that at some future time the court may again be willing to hold out the embezzler as an officer of the court worthy of a client's trust,"* id., *123 U.S.App.D.C. at 274, 359 F.2d at 258, the court did not go on to say that disbarment, to the contrary, would forever preclude reinstatement.*

**10.** In stressing that Rule XI, § 15 is designed to assure due process, I do not intend to suggest that this particular procedure is constitutionally required. I simply am saying that this court, in trying to assure fairness, issued rules which can be construed to operate in furtherance of—not inconsistent with—§ 11–2503(a).

**11.** *Although we do not reach the question of the proper disposition of this case under Rule XI, it is not true that we would have confronted a problem with our new standard of review in § 7(3), as amended.* This is a case of first impression, with the Board voting five to four in favor of a five-year suspension over disbarment. Given our responsibility to begin setting standards for "moral turpitude" crimes, it *would not necessarily be a breach of faith with our new standard if the court were to find a* five-year suspension "unwarranted" for violation of 18 U.S.C. § 1503 (1970) and hold that disbarment was the proper remedy. On the other hand, assuming that the record supports the Board's recommendation, *I have confidence that the seven members of the court in the majority would remain faithful to our oath of office and adopt that disposition.*

As indicated earlier, if I could perceive a sound basis for believing that this court at any time had officially rejected § 11–2503(a), such that the court now had to reverse itself, I would consider clarifying the applicability of § 11–2503(a) prospectively and judging this case instead under Rule XI, including the standard of review in § 7(3), as amended. I conclude, however, that the court, until now, has not so addressed the question. Nor is there evidence that anyone from the court, Bar Counsel's office, or the Board gave Colson reason to assume that Rule XI comprised the entire disciplinary universe. At most, the court has diverted attention from the statute by adopting a comprehensive Rule XI which ostensibly covers all bases, although an inconsistency becomes apparent when the rule is compared with the enabling statute.

Under these circumstances, I find the court, in Colson's case, merely resolving a fundamental legal question which must be settled before there can be a proper disposition. Lawyers and judges routinely have to compare governing statutes and related court rules for consistency. There is nothing inherently unfair—no violation of due process—in doing so here, especially when Colson received full and fair hearings before the Board's hearing committee, the Board itself, and this court.[12]

### IV.

In summary, the general provisions of D.C.Code 1973, §§ 11–2501 and 11–2502 do not provide a basis for rejecting the specific language of § 11–2503(a); the dissenters' legal argument for ignoring that provision is an all-too-thin bootstrap. Furthermore, I can find no evidence to support the view that this court has openly, let alone officially, rejected D.C.Code 1973, § 11–2503(a) at any time prior to this case. Finally, there is no basis for judging Colson only under Rule XI and announcing prospective application of § 11–2503(a); to do so would elevate a legal question to a legal excuse.

Colson, accordingly, must be disbarred under the statute.

---

12. The only procedural problem I can think of would be the question whether it is appropriate to disbar under the statute when the Board, after reviewing the majority opinion, conceivably might want to reconsider whether Colson did, after all, commit a crime involving moral turpitude—in which case a remand might be the appropriate disposition. I reject the remand approach, however, for the record is assuredly complete for purposes of our making a moral turpitude determination.